**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JEREMI TAYLOR**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 23-2140-KSM** |
| **THE SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY (SEPTA),** | |
| Defendant. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                                 **June 27, 2024**

Plaintiff Jeremi Taylor is a practicing Muslim who works as a construction equipment operator for Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA").  In this lawsuit, he contends that SEPTA violated his First Amendment rights and discriminated against him when it insisted that he drink water during Ramadan so that he could provide a urine sample for mandatory drug testing.  (Doc. No. 5.)  The parties have filed cross motions for summary judgment as to all issues of liability.  (*See* Doc. Nos. 18, 24, 28.)  For the reasons discussed below, each motion is granted in part and denied in part.

## I.    BACKGROUND[1]

SEPTA is a regional public transit authority and an instrumentality of the Commonwealth of Pennsylvania.  (Doc. No. 38 at ¶ 3.)  Taylor has worked at SEPTA as a construction equipment operator since 2007.  (Doc. No. 40-2 at ¶ 41.)  He holds a commercial driver's license ("CDL"), and his work consists mainly of driving a large "box truck" with supplies and spare

---

[1] Many of the underlying facts are undisputed.  Where a material fact is in dispute, the Court notes as much.

parts from a SEPTA warehouse to other SEPTA locations.  (*Id.*)  Taylor's job is considered a "safety sensitive" position under the Department of Transportation's ("DOT") regulations.  *See* 49 C.F.R. § 655.4 (explaining that a "safety sensitive function" includes "operating a nonrevenue service vehicle, when required to be operated by a holder of a [CDL]").

### A.    Regulatory Drug Testing Requirements

As a public transportation service provider and recipient of federal funding, SEPTA must comply with the safety regulations issued by the DOT's Federal Transit Administration.  *See* 49 C.F.R. §§ 40.1, 655.3, 655.4.  These regulations include drug and alcohol testing requirements for employees, like Taylor, who perform safety-sensitive functions.  *Id.* § 655.21 ("An employer shall establish a program that provides testing for prohibited drugs and drug metabolites in the following circumstances:  pre-employment, post-accident, reasonable suspicion, random, and return to duty/follow-up.").  The relevant regulations are contained in 49 C.F.R. Part 40.  *See id.* § 401(a), (b).

### 1.    Procedures for Random Testing

Under Part 40, SEPTA is required to conduct random drug tests pursuant to a written testing plan.  *Id.* § 655.21; *see also id.* § 655.12 (requiring that an employer's "anti-drug use and alcohol misuse program shall include . . . [a] statement describing the employer's policy on prohibited drug use" and "all of the elements specified in § 655.15"); *id.* § 655.15 (effective through May 31, 2023)[2] (directing that policy statements must outline, among other things, the "specific circumstances under which a covered employee will be tested for prohibited drugs," the "procedures that will be used to test for the presence of prohibited drugs," and a "description of

---

[2] For purposes of this Memorandum, the Court relies on the regulations that were in effect in 2022 and 2023 when Taylor claims SEPTA discriminated against him.

the kind of behavior that constitutes a refusal to take a drug . . . test"); (*see also* Doc. No. 40-7 at Ex. 1 (SEPTA's Drug Free Workplace Program Manual)).  Random tests are meant to "deter employees from using drugs and misusing alcohol" because "employees know they will be tested" but "they are never quite sure when."  Office of Drug and Alcohol Policy and Compliance ("ODAPC"), *What Employers Need to Know about DOT Drug and Alcohol Testing*, at 16 (June 1, 2015), https://www.transportation.gov/sites/dot.gov/files/docs/ODAPC_Employer _Guidelines_%20June_1_2015_A.pdf.[3]  "A covered employee may be randomly selected for prohibited drug use anytime while on duty."  49 C.F.R. § 655.45(i).  Random selections and testing must occur at least once a quarter, but many employers, including SEPTA, test more frequently.  ODAPC, *What Employers Need to Know about DOT Drug and Alcohol Testing*, at 16 (June 2015).

SEPTA tests on a weekly basis that runs from Sunday to Saturday with tests occurring at various times each day.  (Doc. No. 40-2 at ¶ 9; Brown Dep. Tr. at 11:12–15 (testifying that SEPTA conducts tests "24/7"); *id.* at 23: 3–11.)  SEPTA uses an outside vendor to generate a random list of approximately 100 employee names for testing each week, which is sent to SEPTA's Drug and Alcohol Program Manager, Paula Brown, the Thursday before the testing week begins.  (Doc. No. 40-2 at ¶¶ 10–11; Doc. No. 40-14 at ¶ 26; Erinoff Dep. Tr. at 16:3–8; Brown Dep. Tr. at 12:3–13:9.)  Brown "distribute[s] the selections . . . evenly throughout the week," and "at about 3:00 a.m. in the morning" before the selected employee's shift, program staff members "start calling people to come in for their testing" either in "the beginning, middle, or end of their shift."  (Brown Dep. Tr. at 12:3–11.)  Anybody that is "not tested within [the one

---

[3] The ODAPC and the DOT's Office of General Counsel "provide written interpretations of the provisions of [Part 40]," and are "the only official and authoritative interpretations" of those provisions. 49 C.F.R. § 40.5.

week] period," because, for example, they are "sick or on vacation," and therefore, not working

at the relevant time, is "excused" from testing.  (*Id.*)  On this point, the ODAPC advises that

when "an employee selected for testing is known" by the employer "to be unavailable during the

selection cycle (legitimate extended absence, long-term illness, etc.)," the employer must

"document the reason and make-up the rate shortfall by making another selection, or make an

extra selection during the next selection cycle."  ODAPC, *Best Practices for DOT Random Drug

and Alcohol Testing*, at 4 (Apr. 2012) (submitted in this case at Doc. No. 40-29).

   That said, "[o]nce the employee is notified to report for testing and the test does not

occur, the opportunity for the random testing is over.  There is no second 'bite of the apple.'"  *Id.*

When an employee is notified that they have been selected for testing, "he or she <u>must proceed

immediately</u> to the collection site . . . .  [*I*]*mmediately* does not mean two hours.  *Immediately*

means that after notification, all the employee's actions must lead to an immediate specimen

collection."  ODAPC, *What Employers Need to Know about DOT Drug and Alcohol Testing*, at

19 (June 2015) (explaining that this ensures the "integrity of the testing process"); *id.*

("[Employers] should have procedures in place to ensure that each employee receives <u>no

advanced notice</u> of selection."); *see also* 49 C.F.R. § 655.45(h) ("Each employer shall require

that each covered employee who is notified of selection for random drug or random alcohol

testing proceed to the test site immediately.").

   2.  <u>Collecting a Urine Sample and the Shy Bladder Procedures</u>

   When the employee arrives at the collection site, they are to be given a sealed collection

container, directed to a restroom, and told to "provide a specimen of at least 45 mL, not flush the

toilet, and return to [the service agent] with the specimen."  49 C.F.R. § 40.63(d) (effective Oct.

1, 2010 to May 31, 2023).  The collector then inspects the sample, ensuring it "contains at least

45 mL of urine," falls within an acceptable temperature range, and does not show any signs of

tampering. *Id.* § 40.65(a) (effective through May 31, 2023).  If the sample is less than 45 mL, the collector is required to "discard the original specimen" and begin the "'shy bladder' procedures" outlined in the regulations.  *Id.*; *see also* § 40.193(b)(1)(i) (effective Jan. 1, 2018 to May 31, 2023) ("As the collector, you must do the following when continuing with a urine specimen collection under this section:  (i) Discard the insufficient specimen . . . ."); ODAPC, *DOT Urine Specimen Collection Guidelines*, at 20 (Jan. 2018) ("If the employee provided an initial insufficient specimen, the collector discards the insufficient specimen . . . .  This is the time when the 'shy bladder' collection process starts.").

Under those procedures, the collector must give the employee another opportunity to provide a sufficient specimen and should encourage the "employee to drink up to 40 ounces of fluid, distributed reasonably through a period of up to three hours." *Id.* § 40.193(a), (b)(1)(ii) (effective Jan. 1, 2018 to May 31, 2023).  "It is not a refusal to test if the employee declines to drink." *Id.*; *accord* ODAPC, *DOT Urine Specimen Collection Guidelines*, at 21 (Jan. 2018).  It is, however, considered a refusal if the employee is unable to provide a sufficient sample during the three-hour period *and* there is no medical reason for this failure.  Notably, the regulations state that "[i]f the employee has not provided a sufficient specimen within three hours of the first unsuccessful attempt to provide the specimen," the collector "must discontinue the collection, note the facts" on the collection form, and "immediately notify" the employer's designated employee representative ("DER").[4]  49 C.F.R. § 40.193(b)(1)(iv) (effective Jan. 1, 2018 to May 31, 2023).  Once notified, the DER "*must*" consult with the designated medical review officer

---

[4] The DER is the "employee authorized by the employer to take immediate action(s) to remove employees from safety-sensitive duties . . . and to make required decisions in the testing and evaluation processes."  49 C.F.R. § 40.3 (effective Jan. 1, 2018 to May 31, 2023).  Paula Brown is the DER for SEPTA.  (Brown Dep. Tr. at 23:7–20.)

("MRO")[5] and "direct the employee to obtain, within five days, an evaluation from a licensed physician, acceptable to the MRO, who has expertise in the medical issues raised by the employee's failure to provide a . . . sufficient specimen." *Id.* § 40.193(c) (effective Jan. 1, 2018 to May 31, 2023).  At SEPTA, the medical evaluation is performed by Dr. Jeffrey Erinoff. (Erinoff Dep. Tr. at 55:7–23.)  If Dr. Erinoff determines that "[t]here is not an adequate basis for determining that a medical condition has, or with a high degree of probability could have, precluded the employee from providing a sufficient amount of specimen," the MRO reviews his findings and if they agree, the MRO "must" mark the employee as having "refus[ed] to test."  49 C.F.R. § 40.193(d)(2) (effective Jan. 1, 2018 to May 31, 2023); *see also id.* § 40.191(a)(5) (effective Oct. 1, 2010 to May 31, 2023) (An employee "refuse[s] to take a drug test" when they "[f]ail to provide a sufficient amount of urine when directed, and it has been determined, through a required medical evaluation, that there was no adequate medical explanation for the failure."); ODAPC, *What Employers Need to Know about DOT Drug and Alcohol Testing*, at 25 (June 2015) ("If the MRO finds that there was no medical reason for the employee to provide an insufficient amount of urine, it is a refusal.").  "An MRO's refusal determination is final and not subject to [employer] review."  ODAPC, *What Employers Need to Know about DOT Drug and Alcohol Testing*, at 28 (June 2015).

SEPTA's shy bladder procedures, for the most part, follow the regulatory framework:

> Shy Bladder.
>
> The employee must provide a urine specimen as promptly as possible. If the employee has not provided the required amount of urine, the employee must be urged to drink up to 40 ounces of fluid, distributed reasonably during the period of up to three hours from

---

[5] The MRO is the "licensed physician[,] who is responsible for receiving and reviewing laboratory results generated by an employer's drug testing program and evaluating medical explanations for certain drug test results."  49 C.F.R. § 40.3 (effective Jan. 1, 2018 to May 31, 2023).

> the time of the first unsuccessful attempt to provide a specimen or
> until the employee has provided a new urine specimen, whichever
> occurs first.
>
> It is not a refusal to test if the employee declines to drink.  Refusal
> to make the attempt to provide a new urine specimen or leaving the
> collection site before the collection process is complete is
> considered a refusal to test.
>
> If the employee does not provide an adequate specimen within three
> hours, the collection procedure shall be ended and the employee
> shall be referred for medical evaluation to determine if the inability
> to void is related to a medical condition.

(Doc. No. 40-7, Ex. 1 at p. 34 (SEPTA's Drug Free Workplace Program Manual).)

### 3.  <u>Consequences of Refusing to Test</u>

When an employee is marked as refusing to submit to a random drug test, they are

prohibited from returning to work in a position requiring a safety-sensitive function until they

"meet[ ] the requirements of 49 CFR Part 40 for returning to duty."  49 C.F.R. § 655.61(b)

(effective through May 31, 2023); *accord id.* §§ 655.49(a), 655.61(a)(3) (effective through May

31, 2023).  The first step in that process is to submit to an evaluation with a substance abuse

professional ("SAP") and complete any education courses or treatment requirements

recommended by the SAP.  *Id.* §§ 40.285 (effective through May 31, 2023), 40.293 (effective

through May 31, 2023).  Once the employee complies with the recommended course of

education or treatment, they are reevaluated by the SAP, who provides a written report to the

DER highlighting the employee's compliance.  *Id.* § 40.301(c)(1) (effective through May 31,

2023).[6]

---

[6] SEPTA's policy similarly states that if it is a non-probationary employee's first non-negative
test result in their career with SEPTA, the result leads only to a mandatory referral to an SAP, as opposed
to immediate discharge.  (Doc. No. 40-7, Ex. 1 at 36; *see also id.* (stating that any future non-negative test
result automatically results in discharge).)  Those employees have up to 90 days to complete the SAP
evaluation and treatment process, during which time the employee "may draw sick benefits."  (*Id.* at 39.)

If the employee successfully completes that process, they may "return to the performance of safety-sensitive functions," after taking a return-to-duty drug test. *Id.* § 40.305(a) (effective through May 31, 2023) ("The employee must have a negative drug test result . . . before resuming performance of safety-sensitive duties."). In addition, after returning to duty, the employee must complete "at least 6 follow-up tests in the first 12 months." ODAPC, *What Employers Need to Know about DOT Drug and Alcohol Testing*, at 18 (June 2015). The SAP may, however, "direct more tests and may extend them for up to five years." *Id.*; (*see also* Doc. No. 40-7 at Ex. 1 pp. 27–28 (SEPTA's Drug Free Workplace Program Manual, which states that each employee is "subject to unannounced follow-up drug and alcohol testing for sixty months")). The follow-up tests "must be <u>unannounced</u>" and the employee "<u>cannot</u> . . . know anything about [the employer's] plan for follow-up testing." ODAPC, *What Employers Need to Know about DOT Drug and Alcohol Testing*, at 18 (June 2015). And all return-to-duty and follow-up drug tests "must be under direct observation," 49 C.F.R. § 40.67(b), meaning the collector (or other designated observer of the same gender) must "watch the employee urinate into the collection container," *id.* § 40.67(j) (effective Jan. 1, 2018 to May 31, 2023).

### B.   Taylor's Drug Tests

Taylor has been subject to drug testing under these regulations several times. First, he was drug tested in 2007 when he was hired by SEPTA. (Doc. No. 40-2 at ¶ 43.) He was also tested after an accident involving a piece of equipment that he and another employee were operating. (*See* Taylor Dep. Tr. at 33:11–35:8.) In addition, throughout his employment, Taylor was included in the pool of employees from which SEPTA randomly selects employees for drug testing. (Doc. No. 40-2 at ¶ 48; *see also id.* ¶ 50 (noting that Taylor was randomly drug tested on

May 9, 2013).[7])  In this case, Taylor takes issue with random testing that occurred in April 2022 and with follow-up testing in March and April 2023.

### 1.   April 2022 Drug Test

In 2022, Ramadan ran from April 1 through May 1.  (Doc. No. 40-4 at ¶ 22.)  On April 6, 2022, Taylor was called by SEPTA's medical department to complete a random drug and alcohol test.  (Doc. No. 40-2 at ¶ 55.)  Taylor immediately left his work location and travelled to SEPTA's medical office, arriving at 11:16 a.m.  (Doc. No. 40-4 at ¶ 21; Doc. No. 40-2 at ¶ 56.)  After passing the alcohol breathalyzer test, Taylor was asked to provide a urine sample, but he informed the collector that he did not have to urinate at that time.  (Doc. No. 40-2 at ¶¶ 57–58.)  The technician marked Taylor as beginning the shy bladder protocol at 11:24 a.m. (*Id.* at ¶¶ 59–61)[8] and told him to sit in the waiting room until he could provide a sample (Doc. No. 40-4 at ¶ 28).

After approximately two hours, Taylor returned to the collection room ready to use the restroom.  (*Id.*)  The collector gave him a cup for the urine sample, instructing Taylor to "[p]ut some in the cup and put the rest in the toilet."  (*Id.* at ¶ 29.)[9]  Taylor followed this instruction,

---

[7] This fact is pulled from testing logs kept with SEPTA's medical department.  (Doc. No. 40-2 at ¶ 50.)  Taylor denies this fact (and others), arguing that SEPTA has not authenticated the logs.  (*Id.*)  However, the Court may consider the logs at summary judgment because they are capable of being authenticated at trial.  *See Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, (3d Cir. 2016) ("The rule in this circuit is that hearsay statement can be considered on a motion for summary judgment if they are *capable of being admissible at trial*." (quotation marks omitted)); *Fend v. Allen-Bradley Co.*, Civil Action No. 17-cv-01701, 2021 WL 5541927, at *1 n.1 (E.D. Pa. Aug. 30 2021) ("In the Third Circuit, hearsay statements and unauthenticated documents may be used to oppose motions for summary judgment so long as they are capable of being admissible at trial." (quotation marks and emphasis omitted)).  In any event, this fact is not material.

[8] It is unclear whether the three-hour period should have begun at this point.  *See* 40 C.F.R. § 40.65(a) (effective May 31, 2023) (requiring technicians to start the shy bladder procedures after the employee provides too little specimen); ODAPC, *DOT Urine Specimen Collection Guidelines*, at 20 (Jan. 2018) ("If the employee provided an initial insufficient specimen, the collector discards the insufficient specimen . . . .  This is the time when the 'shy bladder' collection process starts.").

[9] The parties dispute what Taylor was told in terms of how much urine to place in the testing cup.

filling the cup "most of the way" and "depositing overage in the toilet."  (*Id.* at ¶ 31.)  The collector used Taylor's sample to fill one testing vial but there was not enough specimen to fill the second vial.  (*Id.* at ¶ 32.)  As required by the relevant regulations, the collector then disposed of the sample and informed Taylor that he would need to provide a second sample.  (*Id.* at ¶¶ 32–33.)  When Taylor responded that he "had no more urine to give," the collector recommended that he drink water.  (*Id.* at ¶ 35.)  The collector also warned that if Taylor did not produce another sample, he could lose his job.  (*Id.*)  Taylor responded that he was fasting for Ramadan and as an observant Muslim, he could not consume any food or water during daylight hours without violating his religious beliefs.  (*Id.* at ¶ 36.)  Another SEPTA agent then chimed in that Taylor would not "want to risk losing [his] job over a refusal to provide a urine sample" and that "a lot" of Muslim employees at SEPTA drink water during Ramadan so that they can provide an adequate urine sample.  (*Id.* at ¶¶ 37–38.)  Taylor asked if he could return and give the sample after sunset, but SEPTA's DER, Paula Brown, told Taylor that SEPTA could not make an exception for him, and she reiterated that if he did not provide a urine sample at that point, SEPTA would consider it a "refusal."  (*Id.* at ¶¶ 39–40; Taylor Dep. Tr. at 149:6–150:7; Doc. No. 40-7, Ex. 1 at p. 20 (SEPTA's Drug Free Workplace Program Manual) (defining "Refusal to Submit to an Alcohol or Drug Test" as including a failure to "provide a sufficient amount of urine or breath when directed, and it has been determined, through a required medical evaluation, that there was no adequate medial explanation for the failure").)

Faced with breaking his fast or jeopardizing his position, Taylor chose to drink several bottles of water.  (Doc. No. 40-4 at ¶¶ 44–45.)  Taylor was not, however, able to provide a urine

---

(*See* Doc. No. 40-2 at ¶¶ 60–62 (SEPTA identifying portions of the record that support finding that Taylor was advised verbally and in writing to place at least 45ml in the cup and Taylor disputing that fact).)

sample in the next 30 to 45 minutes, at which point the collector told him he was at the end of the three-hour delay period allowed by the regulations.  (*Id.* at ¶¶ 45, 48; *see also* Taylor Dep. Tr. at 126:17–131:22.)  At that point, the collector marked Taylor as having a "shy bladder," drew his blood, and waited for him to produce a urine sample for purposes of determining whether there was a medical reason for his inability to produce a sufficient urine sample in the allowed timeframe.  (Taylor Dep. Tr. at 126:17–131:22.)  When Taylor was able to provide a urine sample at that point, he asked the collector if this sample could be used for purposes of the drug test, but the collector told him it was too late and, after taking a small vial from the sample, discarded the remainder.  (*Id.*)

Taylor returned to work, and later that day, received a call from Brown, directing him to provide a letter from his Imam confirming that Taylor was fasting for Ramadan.  (Doc. No. 40-4 at ¶ 49.)  The next day, at the direction of one of his supervisors, Taylor called SEPTA's equal employment opportunity director, Carol O'Neal, and told her about the incident.  (*Id.* at ¶ 69; Taylor Dep. Tr. at 65:2–66:11, 99:2–14, 111:13–112:4.)  She apologized to Taylor, told him that "it should not have happened," and asked him to send her an email documenting the incident in writing.  (Doc. No. 40-4 at ¶ 69.)  Taylor never sent the email.  (Taylor Dep. Tr. at 150:8–9, 152:23–153:5.)

On April 8, 2022, Taylor submitted a letter from his Imam to Brown, Chester Graham (one of Taylor's supervisors), and Bill Bannon (Taylor's union representative).  (Doc. No. 40-4 at ¶¶ 50, 54, 70; Doc. No. 40-17 (copy of letter).)  The next Monday, April 11, 2022, Taylor received another phone call from Brown, who directed him to meet with SEPTA's medical director, Dr. Erinoff, on April 13.  (Doc. No. 40-4 at ¶ 55.)  After meeting with Taylor, Dr. Erinoff concluded that Taylor's inability to provide a urine sample was a religious issue, not a

medical issue.  (*Id.* at ¶ 59; *see also* Erinoff Dep. Tr. at 58:7–65:5; Doc. No. 40-18 (Dr. Erinoff's shy bladder evaluation report, which states, "I believe adherence to deeply held religious beliefs should be considered").)  Two days later, on April 15, Taylor received a third phone call from Brown, this time telling him that he had been suspended from work without pay pending a mandatory evaluation by an SAP and completion of a drug counseling program.  (*Id.* at ¶ 60; *id.* at ¶ 62 (Taylor attesting that Brown told him he "could either comply with the request or face termination"); Doc. No. 40-23 (referral to SAP, signed by Taylor, who added, "I do not agree to this").)  Taylor objected to having to attend the program but nevertheless completed it and was permitted to return to work on May 24, 2022.  (Doc. No. 40-4 at ¶¶ 63, 67; Doc. No. 40-23.)  During his suspension, Taylor used approximately 40 days of accumulated personal and sick time, and he received only 60% of his regular pay.  (Doc. No. 40-4 at ¶ 68.)

Throughout April and May 2022, Taylor spoke to Brown, Dr. Erinoff, Graham, Bannon, and SEPTA's labor relations department, explaining that he believed SEPTA had coerced him to drink water in violation of his sincerely held religious beliefs.  (Doc. No. 40-4 at ¶¶ 69–71.)  On April 18, 2022, Bannon filed a grievance on Taylor's behalf.  (*Id.* at ¶ 73; *see also* Doc. No. 40-19 at 13 (copy of grievance).)  That grievance was denied on July 13, 2022, without SEPTA making any attempt to discuss an accommodation.  (Doc. No. 40-4 at ¶ 73; Doc. No. 40-19 at 25 (denial by Chief Engineering Officer—Track Department following contract grievance hearing); *id.* at 2–3 (record of denial on appeal by hearing officer following labor relations step hearing).)

On April 20, 2022, while the grievance was pending, Brown emailed a representative of the DOT, requesting guidance on how to handle Taylor's situation and asking whether the regulations allow a religious exemption from random drug testing.  (Doc. No. 40-4 at ¶ 81; Doc. No. 40-15.)  The agency responded:

> There is nothing in regards to religious exemption. The employee is encouraged to drink water. OST/ODAPC suggests that employers attempt to schedule tests (if possible) outside of Ramadan (1 month) or outside of the times of the day when fasting is a requirement (sunrise to sunset).

(Doc. No. 40-15.)

On August 19, 2022, Taylor filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was dual filed with the Pennsylvania Human Relations Commission ("PHRC"). (Doc. No. 40-4 at ¶ 74.) And on March 9, 2023, at Taylor's request, the EEOC issued a Notice of Right to Sue. (Doc. No. 5-1 at 2.)

**2.** **March and April 2023 Drug Tests**

As part of Taylor's plan for returning to work, the SAP had directed that he complete follow-up testing for five years. (*See* Doc. No. 40-22 (SAP Follow Up Evaluation).) Worried that this follow-up testing would occur during Ramadan in 2023, Taylor's attorneys prepared a letter for delivery to SEPTA, which warned SEPTA that "[a]ny attempts on the part of SEPTA or its agents to coerce Mr. Taylor into consuming any food or drink during daylight hours while he is observing Ramadan would constitute a further violation of his rights." (Doc. No. 40-27.) It is unclear when this letter was delivered to SEPTA, but the parties seem to agree that SEPTA management received a copy no later than the day before Ramadan began in March 2023. (*See* Taylor Dep. 17:22–18:7 (testifying that he gave a copy of the letter to his supervisor right before Ramadan began in March 2023).) Despite this letter, Taylor was required to test twice during the holiday, first, on March 23 and second, on April 11. (Doc. No. 40-4 at ¶ 77.)[10] Both days, Taylor's work shift ran from 6:00 a.m. to 2:00 p.m. (*Id.* at ¶ 76.) That meant that both shifts began before sunrise. Like the year before, Taylor was "required to break [his] fast on both

---

[10] In 2023, Ramadan ran from March 22, 2023 through April 20, 2023.

occasions in order to provide a sufficient amount of urine." (*Id.* at ¶ 78.)

In addition, Taylor was required to take every follow-up test, including those in March and April 2023, under "direct observation," meaning that Taylor was required to expose his genitals to a technician while providing a sample. (*Id.* at ¶ 81.) Taylor claims this practice is also inconsistent with his religious beliefs because "[a]s an observant Muslim, [he is] required to dress modestly at all times and not . . . reveal [his] body from [his] naval to [his] knees." (*Id.* at ¶ 82.)

Taylor will be subject to follow-up testing until June 2027. (*Id.* at ¶ 80; *see also* Erinoff Dep. Tr. at 76:5–77:24 (confirming that the SAP who evaluated Taylor recommended follow-up testing for five years with testing twice per month during the first year, once per month during the second year, and six times per year in years three through five); Doc. No. 40-22 (SAP Follow Up Evaluation).) That said, in February 26, 2024, SEPTA sent a letter to Taylor's counsel, confirming that "SEPTA will not schedule [Taylor] for [a] follow-up drug test during the upcoming month of Ramadan" in 2024 and that "if [Taylor] is randomly selected for drug testing during Ramadan 2024, SEPTA will either postpone the random test or conduct the random test at the beginning of [Taylor's] 6:00 a.m. shift, before the sun has risen." (Doc. No. 40-28.) The letter explains that this "decision is based on new guidance issued by the U.S. Department of Transportation in December 2023 concerning drug testing during religious observances." (*Id.*)

## II.   PROCEDURAL HISTORY

Taylor filed this action against SEPTA on June 5, 2023. (*See* Doc. No. 1.) Taylor claims that SEPTA failed to accommodate his sincerely held religious beliefs in violation of Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Rights Act (the "PHRA"). (Doc. No.

5 at 18–20.)[11]   He also brings one claim pursuant to 42 U.S.C. § 1983, contending that SEPTA

violated his First Amendment rights when it "coerced [him] into drinking water in violation of

his Ramadan fast in both 2022 and 2023" and when it refused "to exercise its discretion and

enforce DOT regulations in a nondiscriminatory manner by allowing Mr. Taylor to appear for his

drug tests outside of fasting hours during Ramadan or during one of the eleven (11) other months

of the year."  (*Id.* at 17.)[12]   The parties have filed cross-motions for summary judgment as to

liability on all remaining claims.  (Doc. Nos. 18, 24, 28.)

## III.   LEGAL STANDARD

Summary judgment is appropriate when the "materials in the record," show that "there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a), (c).  "[T]he mere existence of *some* alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary judgment; the

---

[11] Taylor also brought discrimination claims pursuant to the Federal Religious Freedom Restoration Act and Pennsylvania Religious Freedom Protection Act.  The parties have stipulated to dismissal of the former (*see* Doc. Nos. 27, 30), and Taylor agreed he is no longer pursuing the latter at oral argument (*see* Draft H'rg Tr. at 34:20–24 ("Plaintiff is not pursuing the state analog in terms of the Pennsylvania act protecting religious freedom.  We acknowledged to Mr. Jesiolowski that the notice requirements were not met, and I didn't know that that was still in the case, and we concede that, Your Honor.").

[12] SEPTA also argues that Taylor's request for punitive damages should be stricken as inappropriate.  (Doc. No. 28-1 at 32.)  Taylor has not responded to this argument (*see generally* Doc. No. 40), so the Court finds the request abandoned, *see, e.g., Campbell v. Jefferson Univ. Physicians*, 22 F. Supp. 3d 478, 487 (E.D. Pa. 2014) ("[W]hen a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure 'constitutes an abandonment of those causes of action and essentially acts as a waiver of th[o]se issues." (quoting *Skirpan v. Pinnacle Health Hosps.*, No. 1:07-cv-1703, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010)); *Seals v. City of Lancaster*, 553 F. Supp. 2d 427, 433 (E.D. Pa. 2008) ("[P]laintiff's failure to mention these issues in her summary judgment response constitutes abandonment of those claims."); *Skirpan v. Pinnacle Health Hosps.*, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010) ("Indeed, a Plaintiff's failure to respond to these arguments constitutes an abandonment of these causes of action and essentially acts as a waiver of these issues."); *Kosciolek v. Wilkes-Barre Fire Fighters Ass'n Local 104*, 2006 WL 3742700, at *3 n.1 (M.D. Pa. Dec. 18, 2006) ("Even if Plaintiff did raise these claims in his Amended Complaint, because he ignored them at summary judgment, they are deemed waived.").

requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. "[A]t the summary judgment stage the judge's function is not [themselves] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

"The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008); *see also Manetas v. Int'l Petroleum Carriers, Inc.*, 541 F.2d 408, 413 (3d Cir. 1976) ("It is well settled that cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed."). "Courts are permitted to resolve cross-motions for summary judgment concurrently," but "[w]hen doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion." *Hawkins v. Switchback MX, LLC*, 339 F. Supp. 3d 543, 547 (W.D. Pa. 2018).

## IV. DISCUSSION

The Court begins with the parties' motions for summary judgment as to Taylor's discrimination claims under Title VII and the PHRA before turning to his claims under the First Amendment.

### A. Title VII and the PHRA Violations

Taylor claims that SEPTA violated Title VII and the PHRA when it failed to reasonably

16

accommodate Taylor's sincerely held religious belief and "coerced" him into drinking water during drug tests in April 2022, March 2023, and April 2023.  (*See* Doc. No. 5 at ¶¶ 129–31.)  SEPTA argues that Taylor's Title VII claim is barred as to the March and April 2023 drug tests because Taylor failed to administratively exhaust those actions with the EEOC and that Taylor's PHRA claims are barred as to all three tests because Taylor did not engage in the administrative process with the PHRC in good faith.  (Doc. No. 28-1 at 10–14.)  In the alternative, SEPTA argues that Taylor's failure to accommodate claims fail on the merits.  (*Id.* at 14–24.)  Taylor responds that he is entitled to move forward on all failure to accommodate claims and that the undisputed facts show that SEPTA failed to reasonably accommodate his sincerely held religious beliefs.  (Doc. No. 18 at 24–31.)

### 1.    Administrative Exhaustion

"Before bringing suit under Title VII in federal court, a plaintiff must first file a charge with the EEOC" within 300 days of the challenged employment action.  *Webb v. City of Philadelphia*, 562 F.3d 256, 262 (3d Cir. 2009); 42 U.S.C. § 2000e-5(e)(1).  After filing a charge, "the plaintiff must then wait 180 days, permitting the EEOC to take action on the complaint."  *Tlush v. Mfrs. Res. Ctr.*, 315 F. Supp. 2d 650, 654 (E.D. Pa. 2002) (discussing identical requirements in context of ADA claim).  Once this 180-day period has passed, the plaintiff may ask the EEOC for a "right-to-sue letter," which the EEOC must issue upon request if the 180-day period has ended.  *Id.*  The plaintiff then has 90 days to file suit.  *Id.*

Like Title VII, the PHRA has its own exhaustion requirement.  Before bringing a claim under the PHRA, a plaintiff must first file a charge of discrimination with the PHRC.  *Tlush*, 315 F. Supp. 2d at 656.  "This may be accomplished either by filing a complaint directly with the PHRA, or by transmittal of an EEOC complaint to the PHRC."  *McIntosh v. White Horse Vill., Inc.*, 176 F. Supp. 3d 480, 482 (E.D. Pa. 2016).  In either case, the filing of a charge "grants the

PHRC exclusive jurisdiction over claims for a period of one year, in order to investigate and, if possible, conciliate claims." *Tlush* 315 F. Supp. 2d at 656; *see also Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 471 (3d Cir. 2001) ("A complainant may not file an action in court for a period of one year.").  "No right-to-sue letter is required in connection with PHRA claims and, after the expiration of one year a complainant may bring suit regardless of whether or not he has received a letter from the PHRC." *Tlush* 315 F. Supp. 2d at 656.

Under both Title VII and the PHRA, the purpose of administrative exhaustion is to place the relevant agency "on notice of the plaintiff's claims and afford it 'the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court.'" *Webb*, 562 F.3d at 262 (quoting *Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996)).  For that reason, exhaustion is a precondition to bringing an employment discrimination suit under either statute.  *See Hickman v. Amazon Fullfilment*, 662 F. App'x 176, 178–79 (3d Cir. 2016) (Title VII); *Griffiths v. CIGNA Corp.*, 857 F. Supp. 399, 405 (E.D. Pa. 1994) (PHRA).  It is not, however, a "jurisdictional prerequisite to suit in federal court," and like a statute of limitations defense, "is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982); *Schafer v. Bd. of Pub. Educ.*, 903 F.2d 243, 251 (3d Cir. 1990) (holding the same); *Griffiths*, 857 F. Supp. at 405 ("[E]xhaustion of administrative remedies is a procedural restriction to the right to bring suit under the PHRA that may be subject to estoppel and waiver . . . .").

On August 19, 2022, Taylor dual-filed a charge of discrimination with the EEOC and the PHRC.  (Doc. No. 40-4 at ¶ 74; *see also* Doc. No. 40-25.)  In his charge, Taylor asserted that SEPTA discriminated against him on the basis of his religion when, "[o]n April 6, 2022, as part of a drug screen, SEPTA employees forced [him] to break [his] Ramadan fast by requiring [him]

to drink water during daylight hours in order to produce a urine sample."  (Doc. No. 40-25 at 13.)

Less than a year later, on March 9, 2023, the EEOC issued the Notice of Right to Sue.  (Doc. No.

5-1 at 2.)  And Taylor filed this action on June 5, 2023.  (Doc. No. 1.)

SEPTA argues that Taylor has failed to exhaust his claims under Title VII and the PHRA

to the extent they are based on his drug tests in March and April 2023 because his charge made

no mention of these later tests.  (Doc. No. 28-1 at 12.)  SEPTA also argues that because Taylor

filed suit before the end of the PHRC's one year period of review, he failed to exhaust any of his

PHRA claims in good faith, such that the Court should find those claims unexhausted.  (*Id.* at

13.)  Taylor does not (and indeed, cannot) dispute that his charge lacked any discussion of drug

testing in 2023.  (*See* Doc. No. 40 at 15–24.)  Instead, Taylor argues that SEPTA waived its

exhaustion defense by not raising it earlier in this action and that in any event, Taylor was not

required to file a new charge of discrimination after each drug test because the 2023 follow-up

tests fall within the scope of the discrimination alleged in Taylor's initial charge.  (*Id.*)  Taylor

does not respond to SEPTA's argument that he failed to exhaust his PHRA claim in good faith.

(*See generally id.*)

a.      Waiver

First, Taylor argues that SEPTA waived its exhaustion defense by failing to timely assert

it.  (Doc. No. 40 at 15.)  As noted above, the exhaustion requirements of Title VII and the PHRA

are not jurisdictional prerequisites.  *See Fort Bend County v. Davis*, 587 U.S. __, 139 S. Ct.

1843, 1850 (2019) ("Title VII's charge-filing requirement is not of jurisdictional cast."); *see also*

43 Pa. Stat. & Cons. Stat. § 962(e) ("The time limits for filing under any complaint or other

pleading under this act shall be subject to waiver, estoppel and equitable tolling.").  Instead, they

are "claim-processing rule[s]" and as such, are "mandatory" only in the "sense that a court must

enforce the rule *if a party properly raises it*."  *Fort Bend County*, 139 S. Ct. at 1849 (quotation

marks omitted) (emphasis added).  "[A]n objection based on a mandatory claim-processing rule may be forfeited if the party asserting the rule waits too long to raise the point."  *Id.* (quotation marks omitted).

Here, Taylor argues that SEPTA waived its exhaustion defense because it failed to raise it in a Rule 12 motion or list it as an affirmative defense in its Answer.  (*See* Doc. No. 40 at 16.) Under Federal Rule of Civil Procedure 8, a party is required to "affirmatively state any avoidance or affirmative defense," including waiver, estoppel, and statute of limitations, in its responsive pleading.  Fed. R. Civ. P. 8(c)(1).  The "purpose of requiring the defendant to plead available affirmative defenses in his answer is to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed."  *Robinson v. Johnson*, 313 F.3d 128, 134–35 (3d Cir. 2002).

Despite Rule 8's mandatory language, the Third Circuit has rejected the notion that a defendant automatically waives an affirmative defense when it fails to assert the defense in its answer.  *See Long v. Wilson*, 393 F.3d 390, 397–98 (3d Cir. 2004); *Robinson v. Johnson*, 313 F.3d 128, 137 (3d Cir. 2002); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 924 n.9 (3d Cir. 1997); *cf. Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 176 (2d Cir. 2014) ("[A] district court may entertain unpleaded affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." (citations omitted)).  For example, in *Robinson*, the court acknowledged that "[t]echnically, the Federal Rules of Civil Procedure require that affirmative defenses be pleaded in the answer."  313 F.3d at 135.  Nevertheless, the court held that "a limitations defense does not necessarily have to be raised in the answer," so long as it is "raised at the earliest practicable moment thereafter."  *Id.* at 135.  The court reasoned

that this more lenient interpretation was "consistent with at least the purpose, if not necessarily the language, of Rule 8(c)," and it avoids prejudice to the plaintiff, while also promoting judicial economy.  *Id.* at 137.

Two years after *Robinson*, the Third Circuit provided further clarification on this issue in *Long*.  *See* 393 F.3d at 397–98.  The *Long* court confirmed that "although an affirmative defense need not be raised in the answer, it must be raised 'as early as practicable' thereafter."  *Id.* at 398 (quoting *Robinson*, 313 F.3d at 137).  The court then adopted the Second Circuit's method for determining whether a defendant has unduly delayed raising an affirmative defense not included in an answer.  *Id.* at 400.  Under that approach, the court considers the potential prejudice caused to the plaintiff by the delay, taking note of "whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction."  *Id.* (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  The court also considers whether the defendant has delayed asserting the affirmative defense in bad faith.  *Id.*; *see also id.* at 401 (concluding that prejudice is "the ultimate issue, and that prejudice turns on such factors as how late in the proceedings the defense was raised, whether the petitioner had an opportunity to respond, and whether the respondent acted in bad faith").

As this discussion suggests, when the Court considers prejudice, it is concerned with prejudice arising from the defendant's *delay* in asserting the affirmative defense, *not* the application of the affirmative defense itself.  In other words, it is not enough for Taylor to show that application of the failure to exhaust defense may result in judgment in SEPTA's favor.  *See Long*, 393 F.3d at 399 ("The frustrated expectation of not having an untimely habeas petition

heard on the merits does not establish prejudice sufficient to defeat an amendment to an answer."); *Nat'l Recovery Agency, Inc. v. AIG Domestic Claims, Inc.*, Civil No. 4:05-CV-0033, 2006 WL 1289545, at *3 (M.D. Pa. May 9, 2006) ("The fact that the plaintiffs' bad faith claims may be determined to be barred by the statute of limitations does not amount to prejudice sufficient to defeat an amendment.").  Instead, Taylor must show that he was harmed by SEPTA's failure to assert that defense earlier in the litigation.

Here, Taylor does not contend that SEPTA's late assertion of a failure to exhaust defense will cause him to expend significant additional resources in discovery or significantly delay the resolution of this case.  Nor has he claimed that SEPTA's delay was caused by anything other than inadvertence.  Instead, Taylor argues that the Court should find SEPTA waived its exhaustion defense because its delay in bringing that defense prevented Taylor from bringing a timely action in another jurisdiction.  (Doc. No. 40 at 15–16.)  Taylor reasons that if SEPTA had "either raised exhaustion in a motion under Fed. R. Civ. 12 or raised the issue by way of an affirmative defense, [he] would have had plenty of time to cure the defect" before the 300-day limitations period for filing a charge of discrimination with the EEOC.  (*Id.* at 16.)  But because that deadline expired in January 2024, Taylor argues that he is unable to satisfy the precondition at this point and may be forced to give up his claims of discrimination related to testing in 2023. (*Id.*)

Although the Third Circuit has not squarely addressed this issue, the Second and Seventh Circuits have.  *See Strauss v. Douglas Aircraft Co.*, 404 F.2d 1152 (2d Cir. 1968); *Daugherity v. Traylor Bros., Inc.*, 970 F.2d 348 (7th Cir. 1992).  In *Strauss*, the Second Circuit held that the district court erred when it granted the defendant leave to amend its answer[13] to add a statute of

---

[13] As *Strauss* and other cases suggest, the waiver issue is often considered in the context of an untimely motion to amend.  In other words, the court considers a defendant's untimely assertion of an

limitations defense four years after the defendant filed its initial answer.  404 F.2d at 1154.  The court emphasized that when a "party seeking to amend wishes to raise a defense of limitations long after the answer was first filed, a court would be remiss if it did not carefully balance the effects of such action for it is manifest that risk of substantial prejudice increases in proportion to the length of defendant's delay in seeking the amendment."  *Id.* at 1155.  The plaintiff had argued that "if the Statute of Limitations had been promptly raised, he could have undertaken various protective measures to avoid being frozen out completely, such as discontinuing this action and renewing it in another appropriate jurisdiction where it would not be time barred."  *Id.*  The court agreed, and it held that "because of the substantial prejudice to [the plaintiff] caused by [the defendant's] excessive delay in raising the Statute of Limitations defense," the defendant should not have been permitted to amend its answer.  *Id.* at 1158; *see also Long*, 393 F.3d at 399 (discussing *Strauss* and emphasizing that the plaintiff in that case "suffered actual prejudice in that his action might not have been time-barred in another jurisdiction had he known about the statute of limitations defense sooner"); *Block*, 988 F.2d at 350 ("[T]he plaintiff in *Strauss* successfully demonstrated that he could have timely brought his action in another forum had the defendant promptly raised its statute of limitations defense.").

The Seventh Circuit has applied *Strauss*'s reasoning in the exhaustion context.  *See Daugherity*, 970 F.2d at 352–53; *King*, 26 F.3d at 724.  In *Daugherity*, the court held that the

---

affirmative defense as an implied (or express) request by the defendant to amend its answer to assert the affirmative defense at a late stage in the litigation.  *See, e.g.*, *Block*, 988 F.2d at 350 ("After observing that the appellees had not in fact moved to amend their answer to include the statute of limitations as an affirmative defense, [the district court] construed their summary judgment motion also as a motion to amend under Fed. R. Civ. P. 15(a)."); *Am. Zinc Recycling Corp. v. TOPCOR Augusta, LLC*, Civil Action No. 15-198, 2020 WL 13879775, at *1 (W.D. Pa. July 6, 2020) ("Presently pending before the Court is TOPCOR's motion seeking leave to file an amended answer and affirmative defenses in order to add the voluntary payment doctrine as an affirmative defense.  This doctrine is also the basis for TOPCOR's pending motion for summary judgment. (internal citation omitted)).

district court erred when it granted the defendant leave to amend its answer to add a failure to exhaust defense three and a half years after the defendant filed its initial answer. 970 F.3d at 352. The court emphasized that "none of this time can be attributed fairly" to the plaintiff. *Id.* "Moreover, this delay was prejudicial" to the plaintiff because although "failure to file an initial complaint with the EEOC is not jurisdictional, failure to file certainly places a significant legal and pragmatic burden on the plaintiff." *Id.* Citing *Strauss*, the court concluded that given the delay and prejudice, "the district court should not have permitted [the defendant] to rely on [the plaintiff's] failure to exhaust administrative remedies" as grounds for dismissal. *Id.* at 353; *see also King*, 26 F.3d at 724 (discussing *Daugherity* and explaining that the "timely assertion" of a failure to exhaust defense "is particularly crucial, as with the pleading of a statute of limitations" because the prejudice "flows directly from the tardy amendment").

Two crucial points—the length of delay and the notice to plaintiff—distinguish this case from *Strauss* and *Daugherity* and weigh against a finding of waiver. First, unlike *Strauss* and *Daugherity*, each of which involved an approximately four-year delay between the filing of the defendant's answer and the defendant's motion to amend, here, only five months passed between the filing of SEPTA's Answer and its motion for summary judgment. *See Long*, 393 F.3d at 399 ("The passage of time factors into the analysis of whether a plaintiff has suffered prejudice by a delay in amending an answer to assert an affirmative defense."); *Block*, 988 F.2d at 350 ("[T]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice."); *Strauss*, 404 F.2d at 1154 (explaining that the length of the delay is important because "it is manifest that risk of substantial prejudice increases in proportion to the length of defendant's delay in seeking the amendment"). Moreover, SEPTA asserted the defense in its first dispositive motion, i.e., the motion for summary judgment, and did not wait

until trial or later.  *Contra Griffiths v. Cigna Corp.*, No. CIV.A. 91–2356, 1994 WL 114899, at

*7 (E.D. Pa. Mar. 30, 1994) (finding the defendant waived exhaustion defense where it

"proceed[ed] through trial and appeal without even oblique reference to such a possible

defense").

Second, unlike the plaintiffs in *Strauss* and *Daugherity*, there is little basis in the record

for finding that Taylor was unfairly surprised that administrative exhaustion would be an issue in

this litigation.  *Cf. Blasband v. Atl. City Showboat, Inc.*, Civil No. 07-5556 (JHR/JS), 2009 WL

10688038, at *1 (D.N.J. July 29, 2009) ("Plaintiff has not established that Defendant's delay in

amending its answer [to include an ERISA preemption defense] will prejudice her. . . .

Defendant asserted the defense in response to Plaintiff's state court complaint[, if not Plaintiff's

federal court complaint].  Furthermore, Defendant raised the defense in its motion for summary

judgment.").  Notably, Taylor brought administrative charges with the EEOC and the PHRA in

connection with the 2022 drug tests, suggesting he knew that he needed to exhaust administrative

remedies before filing suit.  *See Pinegar v. Nicholson*, CIVIL ACTION NO. 1:07-CV-0313,

2008 WL 11363781, at *1 (M.D. Pa. May 1, 2008) (allowing defendant to amend answer to add

"the additional affirmative defense of failure to exhaust administrative remedies" and finding

"plaintiff would not prejudiced by the amendment because the exhaustion defense merely

presents a legal issue arising from plaintiff's actions in seeking relief, *which were known to

plaintiff at the time she filed the complaint*" (emphasis added)); *Doe v. Pa. Dep't of Corr.*, 1:20-

CV-00023-SPB, 2023 WL 5003228, at *1 (W.D. Pa. Aug. 4, 2023) (same).  Indeed, at the

pleading stage, *Taylor* acknowledged that exhaustion remained an open issue because he had not

yet exhausted his PHRA claims.  (*See* Doc. No. 5 at ¶ 4 ("As of August 19, 2023, Mr. Taylor

will have exhausted his administrative remedies in connection with his claims against SEPTA

under the Pennsylvania Human Relations Act . . . .").)  And although SEPTA did not mention

exhaustion in its affirmative defenses, neither did its Answer admit that Taylor had satisfied its

exhaustion requirements.[14]  *Cf. Woodson*, 109 F.3d at 924 n.9 (finding, before *Robinson* and

*Long* were decided, that the defendant "preserve[d] the defense" of failure to exhaust because

although the defendant "never pleaded [the exhaustion] issue as an affirmative defense, it denied

in its answer [the plaintiff's] allegation that he had exhausted his administrative remedies," and

the defendant raised the exhaustion argument "in its summary judgment motion, in its final pre-

trial memorandum, and at trial, and also asked relevant questions in its request for

admissions").[15]  *Contra Griffiths*, 1994 WL 114899, at *7 (finding the defendant waived

exhaustion defense where its answer included admission that the plaintiff exhausted

administrative remedies).  This further suggests that Taylor had some warning that exhaustion

would be an issue in this case as it progressed.

Given the limited delay in SEPTA raising the defense and the suggestion that Taylor

knew exhaustion was an open issue and made a conscious decision *not* to file a separate or

amended charge in connection with the 2023 drug tests, the Court will allow SEPTA to amend

---

[14] On this point, SEPTA stated, "The allegations in paragraph 3 contain conclusions of law to which no responsive pleading is required."  (Doc. No. 15 at ¶ 3.)

[15] Taylor does not discuss *Woodson*, and instead, relies on *Williams v. Runyon*, 130 F.3d 568 (3d Cir. 1997).  In *Williams*, the Third Circuit stated that a "defendant bears the burden of *pleading* and proving that the plaintiff has failed to exhaust administrative remedies."  130 F.3d at 573 (emphasis added).  Some courts have read this line in *Williams* as requiring a defendant to plead failure to exhaust as an affirmative defense in its answer.  *See, e.g.*, *Douglas v. Ctr. for Comprehensive Care/Jersey City Med. Ctr.*, Case No. 16-9146 (SDW) (LDW), 2019 WL 1379880, at *4 (D.N.J. Mar. 26, 2019).  But we are not convinced.  *Williams* did not involve a question of whether the defendant had failed to include the lack of exhaustion defense in its answer or a Rule 12 motion.  Instead, the *Williams* court was concerned with whether the defendant had *proven* failure to exhaust during trial.  *Id.* at 573–74.  Given this distinction, *Williams* is merely persuasive authority, which cannot overcome the binding, on-point rulings of *Robinson*, *Long*, and *Woodson*.

its answer to include a failure to exhaust affirmative defense and considers that defense at summary judgment.

       b.   <u>Exhaustion</u>

The Court considers next whether Taylor exhausted administrative remedies for his Title VII claims and PHRA claims in turn.

       i.   *Title VII*

SEPTA argues that Taylor failed to exhaust administrative remedies for his Title VII claims related to follow-up drug testing in March and April 2023 because his charge did not mention those tests.  (Doc. No. 28-1 at 10.)  Taylor does not deny that he did not file a charge of discrimination for his 2023 drug tests, and instead, he argues that he did not need to file a new charge because the alleged 2023 violations were "substantively identical" to the exhausted 2022 violations.  (Doc. No. 40 at 17.)

As noted above, Title VII makes administrative exhaustion a mandatory precondition to filing suit, specifying that "[a] charge . . . *shall be* filed within" either 180 or 300 days "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) ("'Shall' makes the act of filing a charge within the specified time period mandatory.").  The term "practice" as used in § 2000e-5(e)(1), "appl[ies] to a discrete act or single 'occurrence,' even when it has a connection to other acts." *Morgan*, 536 101 U.S. at 111.  That means, "[e]ach discrete discriminatory act starts a new clock for filing charges" with the EEOC, and an employee cannot revive an untimely claim by later filing a timely charge in connection with a different discrete act.  *Id.* at 111, 113 (rejecting the argument that "related discrete acts" may be considered "a single unlawful practice for the purposes of timely filing").

The question remains, however, whether a plaintiff, after timely filing an initial charge of

discrimination, needs to file a new or amended charge for every discrete act of discrimination that occurs afterward.  Before *Morgan*, the Third Circuit held that a plaintiff is not required to file a new or amended charge of discrimination so long as the later discriminatory act "falls within the scope of a prior EEOC complaint or the investigation which arose out of it."  *Waiters v. Parsons*, 729 F.2d 233, 235 (3d Cir. 1984) ("A victim of discrimination is not required to exhaust administrative remedies with respect to a claim concerning an incident which falls within the scope of a prior EEOC complaint or the investigation which arose out of it, provided that the victim can still bring suit on the earlier complaint.").  After *Morgan*, however, the Circuit Courts of Appeals have been split on this issue.  *See Griggs v. SEPTA*, Civil Action No. 14-6226, 2015 WL 4476772, at *3–4 (E.D. Pa. July 22, 2015) (recognizing a "split among Courts of Appeals about whether *Morgan* should be read broadly to require a plaintiff to file a separate charge when independently actionable acts occur during or after the conclusion of an administrative investigation,"  noting that at the time, the "Third Circuit has not weighed in on this issue in a precedential case," and collecting cases from the 4th, 8th, 9th, 10th, and 11th Circuits).

    In 2021, the Third Circuit acknowledged that the rule in *Waiters* remains the law in this Circuit.  *See Simko v. United States Steel Corp.*, 992 F.3d 198, 207 (3d Cir. 2021).  Under that test, to determine "whether a later claim needs to be exhausted despite the filing of a previous charge," the court considers "whether 'the acts alleged in the subsequent suit are fairly within the scope of (1) the prior EEOC complaint, or (2) the investigation arising therefrom.'"  *Id.* (quoting *Waiters*, 729 F.3d at 237); *see also Antol*, 82 F.2d at 1295 (explaining that the test is "whether the acts alleged in the subsequent [judicial complaint] are fairly within the scope of the prior [administrative charge], or the investigation arising therefrom" (quotation marks omitted));

*Waiters*, 729 F.2d at 237 (recognizing that the Third Circuit has "permitt[ed] suits based on new acts that occur during the pendency of the case which are fairly within the scope of an EEOC complaint or the investigation growing out of that complaint, without requiring the victim to file additional EEOC complaints") (collecting cases).  This is a "highly fact specific" inquiry, requiring the Court to "examine carefully the prior pending EEOC complaint and the unexhausted claim on a case-by-case basis before determining that a second complaint need not have been filed."  *Simko*, 992 F.3d at 207 (quotation marks omitted).  Indeed, in *Simko*, the Third Circuit explicitly declined to adopt any type of "per se rule" on this issue.  *Id.* at 207–08.

Taylor argues that the Court should find his claims for drug testing in 2023 exhausted because they fall within the scope of a reasonable investigation into Taylor's initial charge for drug testing in 2022.  (Doc. No. 40 at 18–23.)[16]  To determine whether a later claim of

---

[16] District courts seem to agree that each allegedly discriminatory drug test is a "discrete act."  *See E.E.O.C. v. U.S. Steel Corp.*, Civil Action No. 10–1284, 2012 WL 3017869, at \*6–7 (W.D. Pa. July 23, 2012) ("Drug tests, drug residue screenings and termination of employment are discrete acts as they occur on a readily identifiable date certain and each constitutes a separate employment practice.  Similarly, this Court holds that the performance of random breath alcohol tests constitute discrete acts because each random breath alcohol test occurs on a readily-identifiable date certain and therefore constitutes a separate employment practice." (citations omitted)); *Wheeler v. Pa. Dep't of Corr.*, Civil Action No. 07-323, 2009 WL 1653555, at \*5 n.30 (W.D. Pa. June 11, 2009) ("Although the plaintiff argues otherwise, the alleged unlawful searches [i.e., drug screenings] on April 17, 2005, combined with the alleged retaliatory searches on August 25, 2005 and November 20, 2005, do not constitute a 'continuing violation' so as to make all of the searches timely."); *Flores v. Entergy Nuclear Ops., Inc.*, 313 F. Supp. 3d 511, 525 (S.D.N.Y. 2018) ("The out-of-period actions Plaintiff alleged in both his Discrimination Charge and his opposition brief—the termination, the alleged fraudulent inducement to enter into the Settlement Agreement, and the random drug testing requirement—are discrete acts that trigger their own 300-day clocks."); *Harris-Bethea v. Babcock & Wilcox Tech. Servs. Y-12, LLC*, No. 3:13–CV–669–TAV–HBG, 2015 WL 1458042, at \*9 (E.D. Tenn. Mar. 30, 2015) ("In this case, the drug testing incidents in October 2009 and October 2010 were discrete acts.  Plaintiff brought her first EEOC charge on November 4, 2011, more than 300 days after the last drug testing incident occurred in October 2010.  Consequently, any discrete claim of discrimination arising from the drug testing incidents in October 2009 or October 2010 under Title VII or the ADA would be time-barred."); *Robinson v. Jackson Pub. Sch. Dist.*, Civil Action No. 3:08cv135–DPJ–FKB, 2011 WL 198127, at \*3 n.2 (S.D. Miss. Jan. 20, 2011) (recognizing selection for random drug testing was a "discrete act"); *cf. O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) ("We can thus take from *Morgan* the following non-exhaustive list of discrete acts for which the limitations period runs from the act: termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, wrongful

discrimination "falls fairly within the investigation arising from the initial EEOC charge," the court considers "the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination," including: "(1) whether the claim arises from the same set of facts that support the original charge and (2) whether the claim advances the same theory of discrimination as the original charge." *Simko*, 992 F.3d at 208–09 (quotation marks omitted); *see also id.* at 211 (explaining that the court should "look for factual similarities or connections between the events described in the [exhausted and unexhausted] claims, the actors involved, and the nature of the employer conduct at issue"). This analysis is "objective rather than subjective," and looks "only at the scope of the EEOC investigation that would reasonably grow out of, or arise from, the initial charge filed with the EEOC, irrespective of the actual content of the Commission's investigation." *Id.* at 208–09 (quotation marks omitted).

Here, a close review of Taylor's exhausted and unexhausted claims shows that they share many factual and legal similarities. Taylor's charge alleged religious discrimination based on SEPTA's failure to accommodate his sincerely held religious beliefs. Taylor claimed that during a random drug test in April 2022, he was coerced into drinking water in violation of his practice of fasting during daylight hours for Ramadan. The factual and legal bases for this claim are nearly identical to the unexhausted claims of religious discrimination that Taylor now asserts in connection with drug testing in March and April 2023. Specifically, Taylor claims that, as with his 2022 drug tests, SEPTA refused to accommodate his sincerely held religious beliefs in that he was required to drink water during daylight hours so that he could produce a urine sample for follow-up testing during Ramadan 2023. Given the similarities between the exhausted and unexhausted claims, it would seem that Taylor's later claims of religious discrimination fall

---

accusation.").

within "the scope of the EEOC investigation which can reasonably be expected to grow out of" his initial charge. *Simko*, 992 F.3d at 208; *see Waiters*, 729 F.2d at 238 ("While it is true that the allegedly discriminatory officials and acts are different, the core grievance—retaliation—is the same and, at all events, it is clear that the allegations of the appellant's complaint fall within the scope of the district director's investigation of the charges contained in the 1979 formal complaint.").

There is, however, one wrinkle in this analysis:  the EEOC closed its investigation into Taylor's initial charge and issued a Notice of Right to Sue on March 9, 2023—weeks before the 2023 drug tests at issue in Taylor's unexhausted claims.  The parties dispute whether this fact forecloses Taylor's argument that the unexhausted claims are reasonably related to the exhausted claim. *Compare, e.g.*, *Green v. Postmaster Gen. of U.S.*, 437 F. App'x 174, 178 (3d Cir. 2011) (holding that unexhausted claim of discriminatory transfer was not fairly within the scope of an earlier filed charge claiming discriminatory failure to promote because the transfer was "a discrete act that occurred after [the plaintiff] had received her right-to-sue letter form the EEO on her earlier claim"); *Miles v. City of Philadelphia*, Civil Action No. 11–4040, 2012 WL 525737, at *7 (E.D. Pa. Feb. 17, 2012) (relying on *Green* and holding that the plaintiff failed to exhaust administrative remedies surrounding her suspension, where she was issued a notice of right to sue on April 26, 2011, filed her federal suit on June 21, 2011, and was suspended on October 13, 2011), *with Vaughn v. Del. Dep't of Ins.*, C.A. No. 19-02314-TMH, 2022 WL 2390182, at *3 (D. Del. July 1, 2022) (declining to "read *Green* as establishing a general rule that an EEOC investigation ending before a discrete employment act takes place cannot satisfy the exhaustion requirement for that act"); *Roy v. Harrisburg Sch. Dist.*, No. 1:18-cv-2356, 2019 WL 13267027, at *6 (M.D. Pa. Apr. 26, 2019) (finding two unexhausted claims of retaliation were fairly within

the scope of the plaintiff's original charge and the ensuing investigation even though the EEOC issued a notice of right to sue before the acts of retaliation occurred).

None of the cases cited above is binding on this Court.  *See Holland v. Holt*, 409 F. App'x 494, 497 (3d Cir. 2010) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quotation marks omitted)); *In re Grand Jury Investigation*, 445 F.3d 266, 276 (3d Cir. 2006) ("Under this court's Internal Operating Procedures, [Non-Published Opinions] 'are not regarded as precedents that bind the court because they do not circulate to the full court before filing.'  *A fortiori,* they are not precedents for the district courts of this circuit." (internal citations omitted)).  Each case, however, may serve as persuasive authority for this Court in deciding the exhaustion issue.

After a thorough review of the relevant cases, the Court finds the reasoning in *Vaughn* and *Roy* to be the more persuasive than that in *Green* and *Miles*.  Importantly, *Green* was decided without the benefit of the Third Circuit's published opinion in *Simko*, which emphasized that the exhaustion analysis is "highly fact specific" and requires a "case-by-case" approach. *Simko*, 992 F.3d at 207.  The *Simko* court refused to adopt any form of "broad per se rule" because it "would eviscerate the remedial purposes of the exhaustion requirement," including providing prompt notice to an employer of the harm alleged and encouraging prompt resolution of those harms.  *Id.* at 207–08; *see also Waiters*, 729 F.2d at 237 (describing rationale behind the "reasonably related doctrine" is that "once the EEOC has tried to achieve a consensual resolution of the complaint, and the discrimination continues, there is minimal likelihood that further conciliation will succeed").  It is also telling that in *Simko* the court characterized the "exhaustion analysis as 'objective' rather than 'subjective,'" meaning the court considers "the scope of the

EEOC investigation that would reasonably grow out of, or arise from, the initial charge filed with the EEOC, irrespective of the actual content of the Commission's investigation." *Simko*, 992 F.3d at 208–09 (quotation marks omitted).  If the actual scope of the EEOC's investigation is immaterial, the date that the investigation closed seems equally immaterial.

Accordingly, the Court finds that Taylor may rely on the reasonably related doctrine to show his 2023 claims are exhausted, even though the EEOC investigation into his closely related 2022 claims ended before the acts giving rise to the 2023 claims occurred.  *See Vaughn*, 2022 WL 2390182, at *3–4 (finding wrongful termination allegation was "closely related" to wrongful suspension alleged in earlier filed EEOC charge such that "a reasonable investigation of the original charge would address" the termination, even though the termination happened *after* the EEOC had completed its investigation and issued a notice of right to sue); *Roy*, 2019 WL 13267027, at *6 (finding two unexhausted claims of retaliation fell "fairly within the scope of what the EEOC was investigating—retaliatory conduct" and therefore, denying motion to dismiss); *see also Duplan v. City of New York*, 888 F.3d 612, 623 (2d Cir. 2018) (recognizing that the Second Circuit previously "applied the 'reasonably related' doctrine to retaliation that occurs after the EEOC investigation is complete, even though the rationale that the retaliation likely was or should have been encompassed by the EEOC investigation is not available in such cases"); *cf. Waiters*, 729 F.2d at 235–37 (finding retaliatory termination claim fell within the scope of the EEOC's investigation of retaliation claims contained in an earlier charge even though more than two years passed between the filing of the charge and the termination and the EEOC director issued a recommendation before the termination).

Given the similarities discussed earlier in this Section, the Court finds that Taylor's claims of religious discrimination based on drug testing in 2023 fall within "the scope of the

EEOC investigation which can reasonably be expected to grow out of" his initial charge.  *See*

*Simko*, 992 F.3d at 208; *Waiters*, 729 F.2d at 238.  Accordingly, Taylor exhausted his Title VII

claims as to drug testing in April 2022, March 2023, and April 2023.

>        *ii.    The PHRA*

That leaves SEPTA's argument that Taylor failed to exhaust his PHRA claims.  (Doc.

No. 28-1 at 12–13.)[17]  Taylor has not responded to this argument, and as such, the Court could

find it abandoned.  *See Campbell*, 22 F. Supp. 3d at 487; *see also, e.g.*, *Seals*, 553 F. Supp. 2d at

433; *Skirpan*, 2010 WL 3632536, at *6; *Kosciolek*, 2006 WL 3742700, at *3 n.1.

In the alternative, the Court agrees with SEPTA that Taylor failed to exhaust

administrative remedies under the PHRA because he failed to engage in the administrative

process in good faith.  "The Pennsylvania Supreme Court has explicitly held that a discharged

employee cannot file a PHRA claim in the judicial system without first exhausting administrative

remedies." *Tlush*, 315 F. Supp. 2d at 656 (citing *Clay v. Advanced Computer Apps., Inc.*, 559

A.2d 917, 919 (Pa. 1989)).  "[I]nvocation of the [administrative] procedures set forth in the

[PHRA] entails more than the filing of a [charge]; it includes the good faith use of procedures

provided for disposition of the complaint." *Lyons v. Springhouse Corp.*, Civ. A. No. 92–6133,

1993 WL 69515, at *3 (E.D. Pa. Mar. 10, 1993) (quoting *Schweitzer v. Rockwell Intern.*, 586

A.2d 383, 387 (Pa. Super. Ct. 1990)); *accord DeAngelo v. Dentalez, Inc.*, 738 F. Supp. 2d 572,

587 (E.D. Pa. Sept. 2, 2010).  Accordingly, "courts in this district have consistently dismissed

PHRA claims filed prior to the expiration of the PHRC's one-year exclusive jurisdiction period."

*Tlush*, 315 F. Supp. 2d at 656–57 (collecting cases); *see also Kozlowski v. Extendicare Health*

---

[17] To the extent SEPTA argues that Taylor's 2023 claims are unexhausted because Taylor did not file a new or amended charge with the PHRC (*see* Doc. No. 28-1 at 12), the Court rejects that argument for the reasons discussed in the previous section in connection with Taylor's Title VII claims.

*Serv., Inc.*, No. 99-4338, 2000 WL 193502, at *4 (E.D. Pa. Feb. 17, 2000) ("The defendants argue, and the plaintiff does not contest, that if a plaintiff brings suit for an alleged PHRA violation during the PHRC's one year conciliation period then the plaintiff has not exhausted his remedies as required by the PHRA and is, thus, barred from asserting a PHRA claim. The defendants are correct." (citations omitted)). *But see Violanti v. Emery Worldwide A-CF Co.*, 847 F. Supp. 1251, 1258 (M.D. Pa. 1994) ("Plaintiff filed his first action based on his layoff from Emery only eight months after filing an administrative claim before the PHRC. Although his federal complaint was premature, that defect is not fatal to his claim and is correctable by the passage of time. More than one year has now passed since his PHRC filing, entitling him to maintain an action on that PHRA claim. Rather than dismiss plaintiff's claim on a curable, technical defect, we will allow his claim to be decided on the merits.").

Here, Taylor dual-filed his charge of discrimination with the EEOC and the PHRC on August 19, 2022. Just over six months later, Taylor requested a notice of right to sue from the EEOC, which the agency issued on March 9, 2023. Taylor then filed this action on June 5, 2023; however, his initial Complaint did not include PHRA claims and instead, noted that those claims would be added once the one-year review period ended. (*See* Doc. No. 1 at 2 n.1.) A few weeks later, on July 24, 2023, Taylor filed an Amended Complaint, which, in an apparent about face, asserted PHRA claims, even though the PHRC retained jurisdiction over Taylor's charge for another 3 to 4 weeks. (*See* Doc. No. 5 at 20.) The inclusion appears purposeful, as Taylor acknowledged in the Amended Complaint that his PHRA claims would not be exhausted until August 19, 2023. (*Id.* at 4.)

This case presents a closer call than others that have addressed this issue. Nevertheless, because Taylor purposefully filed his PHRA claims weeks before the one-year mark, the Court

finds Taylor did not engage in the administrative process in good faith. *See DeAngelo*, 738 F. Supp. 2d at 588–89 (granting summary judgment and finding the plaintiff failed to exhaust administrative remedies where she "requested a right to sue letter from the EEOC and filed suit in federal court before the one-year period had expired," causing the PHRC to close the file administratively pursuant to its internal policy");[18] *Nicholls v. Wildon Indus., Inc.*, No. C.A. 98–6697, 1999 WL 1211656, at *4 (E.D. Pa. Dec. 10, 1999) (granting summary judgment in defendant's favor where the plaintiff filed PHRA claims before the end of the PHRC's exclusive one year review period); *see also Tlush*, 315 F. Supp. 2d at 656–57 (dismissing PHRA claim for failure to exhaust where the plaintiff filed claim less than a month after dual-filing charge with the PHRC); *Kozlowski*, 2000 WL 193502, at *4 (dismissing PHRA claim for failure to exhaust where the plaintiff filed the claim just over five months after filing her administrative complaint with the PHRC); *Lyons*, 1993 WL 69515, at *3 (finding the plaintiff had "not made a good faith attempt to exhaust his remedies under the Act" because he "filed the present action within six months of filing the charges with the PHRC," and the PHRC dismissed those charges before the one year mark pursuant to a policy of "dismissing all charges that have been filed in the federal court").

\*       \*       \*

Summary judgment is granted in SEPTA's favor as to Taylor's PHRA claims because he failed to administratively exhaust those claims. Because Taylor administratively exhausted his Title VII claims, the Court proceeds to merits analysis on those claims.

### 2.    Merits Analysis

Taylor argues that SEPTA violated Title VII's prohibition against religious

---

[18] It is unclear from the record whether the PHRC closed Taylor's file early in this action.

discrimination when it coerced Taylor into drinking water in violation of his Ramadan fast during his random drug test in April 2022 and his follow-up drug tests in March and April 2023.

a. <u>Legal Standard</u>

Title VII renders it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). The term "religion" is defined to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e-2(j). These provisions require "employers to make reasonable accommodations for their employees' religious beliefs and practices unless doing so would result in 'undue hardship' to the employer." *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000).

"To establish a prima facie case of religious discrimination, the employee must show: (1) she holds a sincere religious belief that conflicts with a job requirement; (2) she informed her employer of the conflict; and (3) she was disciplined for failure to comply with the conflicting requirement." *Webb*, 562 F.3d at 259; *id.* at 261 (agreeing that the plaintiff established a prima facie case of religious discrimination because her "religious beliefs are sincere, her employer understood the conflict between her beliefs and her employment requirements, and she was disciplined for failing to comply with a conflicting official requirement"). Once the plaintiff shows each factor is satisfied, the "burden shifts to the employer to show that it made a good-faith effort to reasonably accommodate the religious belief, or such an accommodation would work an undue hardship upon the employer and its business." *Id.*; *accord Shelton*, 223 F.3d at 224.

37

With this legal framework in mind, the Court addresses whether Taylor has put forth evidence to support a prima facie claim of religious discrimination in connection with his drug tests in April 2022, March 2023, and April 2023,[19] and if so, whether SEPTA has put forth evidence to show that it satisfied its Title VII obligations.[20]

---

[19] Taylor also claimed in his charge that he was "further discriminated against on the basis of [his] religion when, on May 20, 2022, [he] was forced to provide another urine sample while a male SEPTA employee looked on," thus "violating [his] religious practice of maintaining modesty in front of others." (Doc. No. 40-25 at 13.)  In his Amended Complaint, Taylor maintained that SEPTA discriminated against him during follow-up drug testing because he was required to display himself to another individual during those tests in violation of his sincerely held religious beliefs related to personal modesty.  In their summary judgment briefing, the parties have not substantively addressed this claim, referring to it only in passing.  However, when asked about the issue at oral argument, the parties agreed that the DOT regulations require that SEPTA have someone observe him during follow-up tests.  *See* Draft H'rg Tr. at 14:4–15 (SEPTA's counsel); *id.* at 47:15–48:2 (Taylor's counsel); *see also Seaworth v. Pearson*, 203 F.3d 1056, 1057 (8th Cir. 2000) ("Assuming, without deciding, that Seaworth established a bona fide religious belief, we agree with the District Court that the IRS, not defendants, imposed the requirement that Seaworth provide an SSN.  Thus, Seaworth's beliefs do not conflict with an employment requirement, and he has not established a prima facie case of religious discrimination." (citations omitted)); *Baltgavis v. Newport News Shipbuilding, Inc.*, 132 F. Supp. 2d 414, 420 (E.D. Va. 2001) (relying in *Seaworth* and finding that "the burden of applying for a waiver of the IRC's statutory penalty provision is also more than de minimis and therefore, constitutes an undue hardship for NNS as a matter of law").  Taylor nevertheless maintains that SEPTA "has the ability to go to the DOT and ask for relief for Mr. Taylor," referencing the regulation's waiver provisions.  (Draft H'rg Tr. at 48:3–7.)  Multiple courts have held that requiring employers to seek a waiver of statutory requirements is an undue hardship.  *See Seaworth*, 203 F.3d at 1057 ("Even if a waiver could be obtained, we think that the expense and trouble incident to applying for it imposes a hardship that is more than de minimis, as a matter of law."); *Baltgavis*, 132 F. Supp. 2d at 420 ("In addition, it is the Court's opinion that applying for a waiver of the IRC's statutory penalty provision is also more than de minimis and therefore, constitutes an undue hardship for NNS as a matter of law."); *EEOC v. Allendale Nursing Ctr.*, 996 F. Supp. 712, 718 (W.D. Mich. 1998) ("There is nothing that indicates that the waiver provision was put in place to benefit the employee who caused the penalties pursuant to section 6723 to be imposed.  The Plaintiff has attempted to transform a section which allows an employer to likely avoid certain penalties if it takes certain steps into a requirement that the employer must take these steps in order to accommodate the employee who caused the penalty in the first place.").  This Court agrees and therefore finds that SEPTA is entitled to summary judgment on this aspect of Taylor's claim.

[20] Taylor suggests that he is entitled to summary judgment as a matter of course because SEPTA refused to engage in the interactive process with him.  But "it is elementary that an employer does not have a duty to accommodate unless the plaintiff establishes each and every element of his *prima facie* case."  *Schwartzberg v. Mellon Bank, N.A.*, No. 02:06cv1006, 2008 WL 111984, at *9 (W.D. Pa. Jan. 8, 2008).  In other words, before deciding if SEPTA failed to accommodate Taylor, we must first determine whether Taylor has shown that it had notice of a conflict, which would have triggered that interactive process.

b.      Prima Facie Case

SEPTA argues that Taylor cannot establish any element of a prima facie case of religious

discrimination based on a failure to accommodate.  (Doc. No. 28-1 at 14–19.)  Taylor argues the

opposite:  that he has established a prima facie case of discrimination in connection with each

drug test.  (Doc. No. 18 at 26–27.)

i.      Conflict

First, SEPTA argues that Taylor cannot show he "holds a sincere religious belief that

conflicts with a job requirement."  SEPTA asserts that its drug testing practices do not conflict

with Taylor's sincerely held religious belief that he cannot consume water between sunrise and

sunset in the month of Ramadan because neither SEPTA's procedure nor the relevant DOT

regulations require the consumption of water.  (Doc. No. 28-1 at 15.)  *See Ansonia Bd. of Educ.*

*v. Philbrook*, 479 U.S. 60, 76 (1986) (Stevens, J., concurring) ("Absent a conflict, it makes no

sense to speak of a duty to accommodate; there is no competing claim on the employee for which

the employer must make adjustments.").  SEPTA is correct that Taylor was not technically

required to consume water.  He was, however, required to provide a urine sample for drug

testing.  It should go without saying that the production of urine is caused by the consumption of

fluids.  Indeed, that is precisely why SEPTA's policies state that "[i]f the employee has not

provided the required amount of urine, the employee *must be urged to drink* up to 40 ounces of

fluid" (Doc. No. 40-7 at 33), and why the technicians in this case encouraged Taylor to drink

water during his initial test in April 2022 (Doc. No. 40-4 at ¶¶ 35–38).  *Cf. Brennan v. Deluxe*

*Corp.*, Civil Action No. ELH-18-2119, 2021 WL 2155004, at *13–14 (D. Md. May 27, 2021)

(rejecting the employer's contention that "there was no conflict between [the employee's]

religious belief and the employment requirement" because regardless of "[w]ether [the

employer] was asking plaintiff to change his personal opinions is irrelevant. Brennan was

sanctioned because he was unwilling to provide the answers sought [on the discrimination questionnaire by his employer].  In turn, that meant he could not complete the [discrimination] Training.  Because Brennan failed to complete the Training, his salary was reduced"); *Schwartzberg v. Mellon Bank, N.A.*, No. 02:06cv1006, 2008 WL 111984, at *9 (W.D. Pa. Jan. 8, 2008) ("The record is completely void of any evidence which reflects that there was a conflict between Plaintiff's religious beliefs (homosexuality is immoral) and Mellon's employment requirements (conduct that denigrates or shows hostility on the basis of sexual orientation is prohibited).  Plaintiff does not allege, and the record does not establish, that Mellon required *or even suggested* that Plaintiff change his beliefs with regard to homosexuality or that he support or condone homosexuality.  Rather, the record clearly reflects that Plaintiff was advised that he was entitled to his beliefs and that his participation in the PFLAG luncheon or other such activities was strictly voluntary." (emphasis added and other emphases omitted)).

The Court also rejects SEPTA's suggestion that Taylor could have complied with SEPTA's drug testing requirements without drinking water because he initially produced a urine sample during the April 2022 test (albeit one that was insufficient and later discarded) without drinking water during daylight hours.  (*See, e.g.*, Draft H'rg Tr. at 29:2–4.)  Although that may have happened during this one drug test, it is unlikely to always be the case.  Under SEPTA's policies, and as mandated by the regulations, the employee selected for testing is not informed of their selection until right before testing.  (*See* Brown Dep. Tr. at 12:3–11); 49 C.F.R. § 655.45(h) ("Each employer shall require that each covered employee who is notified of selection for random drug or random alcohol testing proceed to the test site immediately.").  An employee like Taylor, therefore, would not know until it was too late that they should, for example, drink a

large amount of water before sunrise or wait to use the restroom until they arrived at the testing site.[21]

In sum, the Court finds that Taylor has shown his sincerely held religious belief (to not drink water during daylight hours in the month of Ramadan) conflicted with an employment requirement that he provide a urine sample for drug tests that were randomly scheduled during his work shift (which because Taylor worked a shift starting at 6 a.m. occurred almost exclusively during daylight hours).

### ii.  Notice

Next, SEPTA argues that Taylor has not shown that he timely informed SEPTA that he needed an accommodation for any drug test.  (Doc. No. 37 at 21–23; Doc. No. 28-1 at 16–17.)

An "employee must give [their] employer 'fair warning' that a particular employment practice will interfere with that employee's religious beliefs."  *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 319 (3d Cir. 2008) (quoting *Reed v. Great Lakes Cos.*, 330 F.3d 931, 935 (7th Cir. 2003)); *see also Reed*, 330 F.3d at 935 ("Title VII imposes a duty on the employer but also a reciprocal duty on the employee to give fair warning of the employment practices that will interfere with his religion and that he therefore wants waived or adjusted.").  It is not enough for a person to "announc[e] one's belief in a certain religion" because even when an employer is aware that the employee observes a particular religious faith, the court will "not charge the employers with possessing knowledge about the particularized beliefs and observances" of that religious sect.  *Wilkerson*, 522 F.3d at 319; *see also Mullen v. AstraZeneca Pharms, LP*, Civil Action No. 23-3903, 2023 WL 8651411, at *3 (E.D. Pa. Dec. 14, 2023)

---

[21] And even if it were feasible, the Court questions whether requiring an employee to hold their bladder for hours on end is healthy or humane.

("Reliance on the existence of a religious belief is not sufficient in and of itself to make out a prima facie case for religious discrimination under Title VII; instead, a plaintiff must actually articulate the religious belief and its relationship to the contested policy.").

Because the notice given in this case varies between tests, the Court examines the random test in 2022 and the follow-up tests in 2023 in turn.

**_Random Testing in April 2022_**

Taylor argues that SEPTA should have been on notice of the conflict between his religious belief and SEPTA's testing requirements before Taylor was chosen for random testing in April 2022.  (Doc. No. 18 at 18.)  He asserts that SEPTA was aware Taylor was an observant Muslim before it ever scheduled his random test, because in 2016, he requested a modified respiratory mask to accommodate his religious practice of growing a beard and his name was included on a list of Muslim employees kept by SEPTA.  (*Id.*)  But, as discussed above, it is not enough for Taylor to show that SEPTA knew he was Muslim or that SEPTA knew he had previously asked for a different accommodation for a different employment practice.  *See Wilkerson*, 522 F.3d at 319 ("[A] person's religion is not like her sex or race, that is, simply announcing one's belief in a certain religion, or even wearing a symbol of that religion (i.e., a cross or Star of David) does not notify the employer of the particular beliefs and observances that the employee holds in connection with her religious affiliation.").  Taylor's interpretation would require employers to be aware of the nuances in the practices of every religion.  Title VII does not impose such a requirement.  *See id.* at 319–20 ("Wilkerson seeks to be permitted to adduce discovery that would show that New Media knew or should have known that the libations ceremony would offend Christians generally.  Such discovery, even if obtainable, is not relevant because we do not impute to the employer the duty to possess knowledge of particularized

beliefs of religious sects.  Even if there was evidence that New Media suspected that the libations ceremony would offend Wilkerson and other Christians, it is undisputed that Wilkerson did not inform the defendants that the libation ceremony would offend her religious beliefs, and therefore they did not have a duty to accommodate her.").

Seemingly aware that this on its own was insufficient, Taylor argues that SEPTA also knew that "other Muslim employees had been required to drink water during daylight hours in Ramadan in violation of their fasts."  (Doc. No. 18 at 18.)  He reasons that given this fact, SEPTA should have known it would need to accommodate him, and as such, it should "have treated Mr. Taylor as unavailable when his name was included on the randomly selected list provided by Defendant's third-party vendor during Ramadan."  (*Id.*)  But this reasoning assumes that all members of a particular religion follow the same practices and will seek the same accommodations.  *See Chandler v. Infinity Ins. Grp.*, No. 2:12–cv–2870–TMP, 2014 WL 2547826, at *11 (N.D. Ala. June 4, 2014) ("Even though Elder was knowledgeable about the Jehovah's Witness religion, neither she nor Infinity was [ ] charged with understanding all of the practices of the religion, much less whether Ms. Chandler personally felt obliged to adhere to any particular practice of the religion.  A contrary result would place an employer in the untenable position of having to inquire into the existence and parameters of the religions observed by its employees, and having to accommodate employees, even when the employees may not adhere to any particular tenets of a religion.").  Again, even when an employer knows that an employee follows a particular religious faith, Title VII does not require the employer to know every tenet of that faith or to intuit whether a given employee follows those tenets.   The burden is on the employee to inform the employer that a particular employment practice conflicts with their sincerely held religious belief.

In the alternative, Taylor argues that he nevertheless timely informed testing staff during his April 2022 test that he could not drink water because he was fasting for Ramadan.  (Doc. No. 18 at 17–18, 26–27.)  SEPTA responds that this notice was too little, too late because "giving notice to co-workers at the same time as an employee violates employment requirements is insufficient to provide adequate notice to the employer and to shield the employee's conduct."  *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1020 (4th Cir. 1996); *Snyder v. Arconic Corp.*, No. 3:22-cv-0027-SHL-SBJ, 2023 WL 6370785, at *9 (S.D. Iowa 2023) ("[T]he law requires Snyder to prove Arconic's awareness that he needs an accommodation *before* he violated the policy.").  The rationale for a prior notice requirement is that once the violation has occurred, it is too late for the employer to provide an accommodation.  *See Chalmers*, 101 F.3d at 1021 (discussing the rationale for the "advance notice requirement"); *Johnson v. Angelica Uniform Grp., Inc.*, 762 F.2d 671, 673 (8th Cir. 1985) ("Johnson clearly did not satisfy the notice element of the prima facie requirements.  Had Johnson informed the plant manager or another supervisor of her need for religious accommodation when she began work at Angelica or at least prior to her absences for religious purposes, her employer would have had the chance to explain the absentee policy in relation to Johnson's religious needs, and perhaps work out an arrangement satisfactory to both parties.  Instead Johnson used fourteen of the allotted sixteen absences in less than six months, and only bothered to notify Angelica of a required extended absence for religious purposes after that absence had begun.").

Along those lines, the Third Circuit has suggested that when an accommodation remains possible, notice in the moment is sufficient.  *See Wilkerson*, 522 F.3d at 319 ("Wilkerson does not allege that she ever informed New Media or its agents that the libations ceremony conflicted with her religious beliefs prior to *or during* the ceremony.  Because she did not inform New

Media that the ceremony presented a conflict, it did not have a duty to accommodate her." (emphasis added)).  Taylor argues that we should find as much here because once Taylor informed testing staff on April 6, 2022 that he was not able to produce a second urine sample without drinking water in violation of his fast, SEPTA had three options for accommodating him.

First, he asserts that SEPTA could have accommodated him by ending "the testing process and determin[ing] that Mr. Taylor should not be treated as having refused to test."  (Doc. No. 18 at 18.)  In support of that argument, Taylor references final rulemaking by the DOT, which was accompanied by the agency's discussion of *recent* revisions to the testing regulations and "examples of what would not be grounds for an employer to determine a refusal" to test:

> Example 1: An employee provides an insufficient quantity of urine, begins the "shy bladder" process, but the process is cut short because the collection site sent the employee away because they were closing before the employee had three hours to produce a sufficient urine specimen per § 40.193(b)(2). If the collection site nevertheless reports this to the employer as a refusal, the employer could determine there was no possibility the employee could have completed the test, and therefore could conclude there was no refusal. Example 2: When an employee leaves a collection site due to a documented family medical emergency, the employer could determine the employee's departure from the collection site did not constitute a refusal. Example 3: If an employer sends an employee to report for a DOT-regulated test, but the collection site is closed or is about to close and sends the employee away, the employer would take this into consideration in determining that a refusal did not occur.

Procedures for Transportation Workplace Drug and Alcohol Testing Programs:  Addition of Oral Fluid Specimen Testing for Drugs, 88 F.R. 27596-01, 2023 WL 3173277, at *27623 (May 2, 2023).  As Taylor notes, this discussion suggests that a DER has discretion to "take[ ] the entirety of the circumstances into account" and find that no refusal to test occurred.  *Id.* at *27622; *see also id.* ("The employer also has the discretion to consider information from the employee to determine if the evidence satisfactorily excuses the employee's conduct.").

The problem with this argument, however, is that this final rule and the DOT's accompanying discussion were not issued by the agency until May 2, 2023—more than a year after Taylor's initial drug test in April 2022.   As SEPTA notes, when Taylor appeared for that test, neither the regulations nor any official guidance suggested an employer, like SEPTA, had leeway to find a non-refusal once the shy bladder protocols had begun.  (Doc. No. 28 at 17.)  To the contrary, the regulations in effect at that time provided that an employee in Taylor's circumstances is deemed to have refused to test:  "As an employee, you have refused to take a drug test if you . . . fail to provide a sufficient amount of urine when directed, and it has been determined through a required medical evaluation, that there was no adequate medical explanation for the failure (see § 40.193(d)(2))."  49 C.F.R. § 40.191(a)(5) (effective Oct. 1, 2010 to May 31, 2023).  And once the shy bladder process began, the regulations provided virtually no discretion to a DER (Brown), a referral physician (Dr. Erinoff), or an independent MRO.  *See id.* § 40.193(c) (effective Jan. 1, 2018 to May 31, 2023) ("As the DER, when the collector informs you that the employee has not provided a sufficient amount of urine . . . you *must*, after consulting with the MRO, direct the employee to obtain, within five days, an evaluation from a licensed physician, acceptable to the MRO, who has expertise in the medical issues raised by the employee's failure to provide a sufficient specimen." (emphasis added)); *id* § 40.193(d) ("As the referral physician conducting this evaluation, you *must* recommend that the MRO make one of the following determinations:  (1) A medical condition has . . . precluded the employee from providing a sufficient amount of urine.  As the MRO, if you accept this recommendation, you must . . . Check 'Test Cancelled' . . . . ; [or] (2) There is not an adequate basis for determining that a medical condition has . . . precluded the employee from providing a sufficient amount of urine.  As the MRO if you accept this recommendation, you must . . . Check

the 'Refusal to Test' box . . . .").

Second, Taylor argues that SEPTA could have accommodated him after the test was finished by retroactively changing the refusal designation to a non-refusal.  But once again the regulations do not support his argument.  To the contrary, they suggest that SEPTA could not change a refusal determination once it was made and that Taylor was required to complete the SAP evaluation and treatment process.  *See* 49 C.F.R. § 40.191(c) (effective Oct. 1, 2010 to May 31, 2023) ("As an employee, if you refuse to take a drug test, you incur the consequences specified under DOT agency regulations for a violation of those DOT agency regulations."); *id.* § 40.285 (effective through May 31, 2023) (clarifying that a "refusal to test . . . constitutes a DOT drug and alcohol regulation violation" and explaining that once an employee has "violated DOT drug and alcohol regulations, [that employee] cannot again perform any DOT safety-sensitive duties for any employer until and unless [they] complete the SAP evaluation, referral, and education/treatment process set forth in this subpart and in applicable DOT agency regulations").

Last, Taylor argues that SEPTA could have accommodated him by applying for an exemption from DOT testing requirements in his case.  But such exemptions are granted "only if the request documents special or exceptional circumstances, not likely to be generally applicable and not contemplated in connection with the rulemaking that established this part" and which circumstances "make [the employer's] compliance with a specific provision of this part impracticable."  49 C.F.R. § 40.7(b).  And even assuming SEPTA would have been granted an exemption in Taylor's case, there is no way it could have known that when it first received his accommodation request *in the middle* of the April 2022 test.  *See id.* § 40.7(a) ("If you want an exemption from any provision of this part, you must request it in writing form the Office of the

Secretary of Transportation . . . .").[22]

Given the mandatory nature of the regulations and guidance in effect in April 2022, the Court agrees that Taylor was required to provide notice to SEPTA of the potential conflict between his religion and SEPTA's random testing policy *before* he was selected for testing.[23] Because he failed to do so, he has not stated a prima facie case of failure to accommodate with respect to his random drug test in April 2022.

### Follow-up Testing in March and April 2023

As for the follow-up testing in March and April 2023, the Court agrees with Taylor that he provided SEPTA with more than sufficient notice of the conflict between its testing requirements and his religious beliefs.  SEPTA argues that Taylor failed to give proper notice because he did not "inform the EEO office of his interest in an accommodation" in writing. (Doc. No. 37 at 22.)  "An employer is on notice of a plaintiff's religion when an employer has enough information to make it aware a conflict exists between the individual's religious practice or belief and a requirement for applying for or performing the job."  *Winans v. Cox Auto., Inc.*, CIVIL ACTION NO. 22-3826, 2023 WL 4353149, at *3 (E.D. Pa. July 5, 2023) (quotation marks omitted).  In the months between Taylor's random test in April 2022 and his follow-up tests during Ramadan in March and April 2023, Taylor informed Brown, Dr. Erinoff, and his direct supervisor that he believed the testing requirement conflicted with his need to fast during Ramadan.  He provided a letter from his Imam to Brown and Dr. Erinoff confirming as much. He informed his union representative, who in turn filed a grievance related to the April 2022

---

[22] In addition, as noted above, *see supra.* n.19, requiring an employer to request a statutory exemption for a single employee would cause an undue hardship.

[23] Although Taylor did not know when or if he would be selected for random testing, he knew that it was always a possibility, and he could have alerted SEPTA of the potential conflict prior to the month of Ramadan.

drug test, which again flagged the conflict for SEPTA. Taylor spoke with SEPTA's equal

employment opportunity director, Carol O'Neal, over the phone about the conflict. He filed a

charge with the EEOC alleging that SEPTA's conduct in April 2022 violated his sincerely held

religious beliefs. And his counsel in this action wrote a letter to SEPTA warning that if SEPTA

required Taylor to drink water in connection with drug testing during Ramadan 2023, it would be

considered religious discrimination.

Given this overwhelming evidence, which is undisputed, the Court finds SEPTA had

sufficient notice of the conflict prior to testing Taylor in March and April 2023. *See Bay v.*

*Pocono Med. Ctr.*, CIVIL ACTION NO. 3:23-cv-688, 2024 WL 1977986, at *4 (M.D. Pa. May

3, 2024) ("On motion to dismiss the court found that Plaintiff plausibly pled he gave Defendant

fair warning of the conflict between his religious beliefs and its vaccine requirement because

although he did not initially disclose that he is a Moorish American Moslem or why his faith

specifically prevented him from receiving a covid-19 vaccine on the exemption form he did

identify his faith to Defendant's management prior to his termination and wore a conspicuous

headdress throughout his employment by Defendant. Likewise, he had previously informed

Defendant of his religious objection to vaccines through 17 years of religious exemption requests

to Defendant's influenza vaccine requirement and an in-depth conversation about his religious

objection to vaccines with Defendant's Chaplain Sherry Sneed in 2012. Moreover, Defendant

did not explicitly ask for particularized information about Plaintiff's beliefs on the exemption

request form and refused Plaintiff's attempts to provide more information about his beliefs once

his request was denied."); *Winans*, 2023 WL 4353149, at *3 (finding the plaintiff provided

sufficient notice where she filed a "generic ticket" with Human Resources, "seeking an

exemption from the [defendant's] vaccine mandate on personal and religious grounds"); *Sistrunk*

*v. Camden Cnty. Workforce Inv. Bd.*, 2007 WL 1175701, at *4 (D.N.J. Apr. 18, 2007) (finding a dispute of fact as to whether defendant had sufficient notice of a conflict where the plaintiff told multiple members of defendant's staff that complying with company policy would be against his "way of life"; the plaintiff discussed the conflict between the policy and his Rastafarian beliefs with one of the defendant's secretaries, who in turn, spoke with other staff members about it; and the plaintiff's friend explained the nature of the conflict to the defendant's executive director).

Accordingly, the Court considers the final element of the prima facie case—whether Taylor was disciplined in connection with his 2023 follow-up drug tests.

### iii.    Discipline

Last, SEPTA argues that Taylor cannot show that he was disciplined in connection with his 2023 drug tests because Taylor provided sufficient urine samples during those tests after consuming water.  (Doc. No. 28-1 at 17–19.)  Taylor argues that the continued threat of termination should he be marked as refusing any follow-up drug test, including the March and April 2023 tests, is "discipline" for purposes of stating a prima facie case.  (Doc. No. 40 at 28.) The Court agrees.

"[C]ourts within this circuit equate 'discipline' with an 'adverse employment action.'" *Mohammed v. Schneider Nat'l Carriers, Inc.*, Civ. A. No. 18-0642, 2018 WL 5634897, at *2 (W.D. Pa. Oct. 12, 2018) (collecting cases).  "An adverse employment action is an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  *Id.* (quotation marks omitted).  There is, however, a circuit split as to whether the threat of an adverse employment action is itself sufficient to meet this element of a prima facie case for a failure to accommodate claim.  *See id.* (collecting cases and discussing split between Ninth and Second Circuits); *see also, e.g. Dixon v. Yellen*, Case No. 22-cv-3496 (APM), 2024 WL 1831967, at *5 n.5 (D.D.C. Mar. 21, 2024) ("Federal courts have

reached opposing conclusions as to whether a 'threat of discipline' is sufficient to state a failure-to-accommodate claim.").  Although the Third Circuit has not spoken to this exact issue, the appellate court ruled on a similar issue in an unpublished opinion earlier this year.  *See EEOC v. Center One LLC*, Nos. 22-2943 & 22-2944, 2024 WL 379956, at *1 (3d Cir. Feb. 1, 2024).  In *Center One LLC*, the court held that the plaintiff-employee stated a claim for constructive discharge where the employee was forced to choose between "violat[ing] the tenets of his faith [and] suffer[ing] the indignity and emotional discomfort of awaiting his inevitable termination." *Id.* at *3.  The court explained that when the facts were viewed "in the light most favorable to the EEOC . . . a reasonable jury could find that [the employee] reasonably felt compelled to resign as a result of intolerable conditions of discrimination at his employer." *Id.* (quotation marks omitted); *see also Johnson v. York Acad. Reg'l Charter Sch.*, Civ. No. 1:23-CV-00017, 2023 WL 6448843, at *6 (M.D. Pa. Oct. 3, 2023) ("Johnson has sufficiently alleged she was presented with only two options—to resign or to work on her Sabbath in violation of religious beliefs. . . . [I]t is our view that the complaint sufficiently alleges that Johnson was left with this binary choice and as a result, was constructively discharged.  Thus, we find that the Johnson has adequately pleaded an adverse employment action and in turn has met the third element required for a prima facie case of discrimination for a failure to accommodate claim.").

Here, there is no dispute that Taylor would have been discharged if he was marked as refusing any follow-up drug test.  (Doc. No. 40-7, Ex. 1 at 36.)  And although Taylor chose to violate his religious beliefs instead of risking termination from his position at SEPTA (and, therefore, cannot make out a claim of constructive discharge), we find it compelling that he would have been able to state a claim for constructive discharge had he chosen otherwise.  An employee faced with the Hobson's choice of violating his religious beliefs or facing termination,

is hardly less harmed when choosing the former than he is when choosing the latter. *See EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 n.5 (9th Cir. 1988) ("We note that although we have occasionally used language implying that the employer must *discharge* the employee because of the conflict, we have never in fact required that the employee's penalty for observing his or her faith be so drastic. The *threat* of discharge (or of other adverse employment practices) is a sufficient penalty. An employee does not cease to be discriminated against because he temporarily gives up his religious practice and submits to the employment policy." (citations omitted)); *Rodriguez v. City of Chicago*, No. 95 C 5371, 1996 WL 22964, at *3 (N.D. Ill. Jan. 12, 1996) ("It is nonsensical to suggest that an employee who, when forced by his employer to choose between his job and his faith, elects to avoid potential financial and/or professional damage by acceding to his employer's religiously objectionable demands has not been the victim of religious discrimination.").

Having reviewed the conflicting case law, this Court agrees with those courts that have found an employee is subject to an adverse employment action in the religious accommodation context when they are given the binary choice of violating their sincerely held religious beliefs or facing termination. *See Federoff v. Geisinger Clinic*, 571 F. Supp. 3d 376, 387 (M.D. Pa. Nov. 23, 2021) (finding the third element of the prima facie case was not at issue because "[t]he Employees sought an exemption from [their employer]; [the employer] rejected those requests; and their policy provides for termination should the Employees fail to get in line");[24] *see also,*

---

[24] The Court recognizes that at least one district court in this Circuit, after discussing the divergent opinions in this area, found that the "majority of the case law, especially in this circuit, concludes that unrealized threats will not satisfy the third prong of the prima facie case for failure to accommodate." *Mohammed*, 2018 WL 5634897, at *4 (citing *Walsh v. Irvin Stern's Costumes*, No. Civ.A. 05-2515, 2006 WL 166509 (E.D. Pa. Jan. 19, 2006) and *Leitch v. MVM, Inc.*, No. Civ.A.03–4344, 2004 WL 1638132 (E.D. Pa. July 21, 2004), among others). But neither *Walsh* nor *Leitch* involved religious discrimination claims, let alone failure to accommodate claims, and we find it telling that those cases and *Mohammed* were decided before the opinions in *Center One, LLC*, *Johnson*, and *Federoff*—all

52

*e.g.*, *Townley Eng'g & Mfg. Co.*, 859 F.2d at 615 n.5; *Khan v. Fed. Rsrv. Bank of N.Y.*, No. 02 Civ.8893(JCF), 2005 WL 273027, at *5 (S.D.N.Y. Feb. 2, 2005) ("[T]he threat of an adverse action is sufficient to meet this element of the prima facie case, provided that the plaintiff can prove that the employer is in fact intransigent and that the threatened action is causally related to the conflict between the employer's policy and the plaintiff's religion.") (collecting cases).

Applying that reasoning to this case, we find that Taylor has satisfied the third prong of a prima facie case. Despite Taylor's numerous requests for accommodation spanning almost an entire year, SEPTA twice scheduled him for drug testing during daylight hours in Ramadan 2023. Although he was not threatened with termination for refusing to drink water, it was clear that he would be terminated if he was found to have refused a follow-up test (Doc. No. 40-7, Ex. 1 at 36) and that he would be marked as having refused to test if he was unable to provide a sufficient urine sample within the three-hour testing window (*id.* at 20). As such, the threat of termination was real and tied to the implicit requirement that Taylor consume water in violation of his sincerely held belief. *Cf. Ahmad v. N.Y.C. Health & Hosps. Corp.*, 20 Civ. 675 (PAE), 2021 WL 1225875, at *18–19 (S.D.N.Y. Mar. 31, 2021) (explaining that "[t]hreats of discipline are sufficient to satisfy the third factor" of a prima facie case for failure to accommodate but nevertheless finding that the plaintiff failed to satisfy this element because he did "not allege that [he] was threatened with discipline or disciplined for failing to work on Ramadan").

\*     \*     \*

In sum, Taylor has stated a prima facie case of failure to provide a religious accommodation as to his follow-up drug tests in March and April 2023. He has not, however,

---

cases from this Circuit which suggest threats of discipline like the one at issue here can amount to an adverse employment action when the employee is given the choice of violating their sincerely held beliefs on the one hand and certain termination on the other.

carried his burden as to random drug testing in April 2022.

       c.       Reasonable Accommodation or Undue Hardship

Focusing on the follow-up tests in March and April 2023, the burden shifts to SEPTA. As discussed above, "[o]nce a plaintiff-employee has demonstrated that a religiously motivated practice conflicts with an employment requirement, the employer may defend in one of two ways." *United States v. Bd. of Educ. for Sch. Dist. of Phila.*, 911 F.2d 882, 886 (3d Cir. 1990). First, it "may demonstrate that it has offered a 'reasonable accommodation.'" *Id.* "[A] sufficient religious accommodation need not be the 'most' reasonable one (in the employee's view), it need not be the one the employee suggests or prefers, and it need not be the one that least burdens the employee." *Shelton*, 223 F.3d at 225. "In short, the employer satisfies its Title VII religious accommodation obligation when it offers *any* reasonable accommodation." *Id.* (emphasis added). If a defendant has proffered no accommodation, however, it may pursue "the second potential line of defense," i.e., that the alternative accommodation proposed "could not be accomplished without undue hardship." *Bd. of Educ. for Sch. Dist. of Phila.*, 911 F.2d at 887. "[U]ndue hardship is shown when a burden is substantial in the overall context of an employer's business." *Groff v. DeJoy*, 600 U.S. 447, 467 (2023); *id.* at 470–71 ("[C]ourts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating costs of an employer." (quotation marks omitted)). Both "economic and non-economic costs" are relevant to the inquiry. *Webb*, 562 F.3d at 259–60; *see also Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 79–85 (1977) (considering potential economic costs to employer of accommodating employee's observance of the sabbath along with noneconomic effect of violating seniority system established by the employer's collective bargaining agreement with the union); *Smith v. City of Atl. City*, __ F. Supp. 3d __, No. 1:19-cv-6865, 2023 WL 8253025, at

*8 (D.N.J. Nov. 28, 2023) (recognizing post-*Groff* that both economic and non-economic costs are relevant to the undue hardship inquiry); *Shields v. Main Line Hosps., Inc.*, __ F. Supp. 3d __, Civil Action No. 2:22-cv-03307-MRP, 2023 WL 7129953, at *6 (E.D. Pa. Oct. 27, 2023) (same).

Here, SEPTA focuses on the undue hardship defense.[25]  It argues that Taylor's proposed accommodations—scheduling his follow-up drug tests outside of Ramadan and/or outside of daylight hours[26]—would impose an undue hardship on SEPTA because doing so, "would not only defeat the purpose of random drug testing but would also place SEPTA outside of compliance with the DOT regulations."  (Doc. No. 28-1 at 19–24.)  The Court agrees that scheduling Taylor's follow-up tests outside of Ramadan would have amounted to an undue hardship, but we cannot agree that the same hardship would have resulted from scheduling his drug tests before sunrise.

Under the DOT regulations governing follow-up tests, an employer, like SEPTA, "must carry out the SAP's follow-up testing requirements."  49 C.F.R. § 40.309(a).  In doing so, the employer may "schedule follow-up tests on dates of [its] own choosing, but [it] *must ensure that*

---

[25] Much of Taylor's briefing focuses on the first available defense, i.e., whether SEPTA failed to engage in good faith in the interactive process.  (*See* Doc. No. 18 at 27–30; Doc. No. 40 at 25–26.)  But SEPTA does not argue that it offered Taylor any accommodation during Ramadan in 2023.  Having failed to do so, it may nevertheless defend against Taylor's religious accommodation claims by showing that the proposed accommodation(s) "could not be accomplished without undue hardship."  *Bd. of Educ. for Sch. Dist. of Phila.*, 911 F.2d at 887; *see also Cherry v. Sunoco, Inc.*, Civil Action No. 07–cv–2235, 2009 WL 2518221, at *6 (E.D. Pa. Aug. 17, 2009) ("Here, Defendant does not contend that it offered Plaintiff any sort of accommodation.  Thus, this matter will turn on the question of whether the employer can demonstrate that it could not accommodate a religious practice without 'undue hardship.'" (quotation marks omitted)).

[26] During oral argument, the parties also suggested that SEPTA could have accommodated Taylor by changing his schedule so that he worked a night shift during Ramadan.  (Draft H'rg Tr. at 24:1–25:1, 52:8–11.)  However, the record suggests that employee shifts are governed by SEPTA's collective bargaining agreements with the relevant unions.  (*See* Taylor Dep. Tr. at 67:20–69:18 (discussing picking of shifts).)  *See also, e.g.*, *Miller v. Port Auth. of N.Y. & N.J.*, 351 F. Supp. 3d 762, 788–89 (D.N.J. 2018) (explaining that an undue hardship "may take the form of economic costs, but may also include non-economic costs, such as damage to employee morale or compromise of a collective bargaining agreement or seniority system").

*the tests are unannounced with no discernable pattern as to their timing, and that the employee is given no advance notice.*"  *Id.* § 40.309(b); *see also id.* § 40.307(g) ("As the employer, SAP, or other service agent, you must not provide to the employee a copy of their drug and/or alcohol follow-up testing schedule prescribed by the SAP.  No employer, SAP, or other service agent will indicate to the employee what the frequency or duration of the employee's follow-up testing schedule will be."); ODAPC, *What Employers Need to Know about DOT Drug and Alcohol Testing*, at 18 (June 2015) (The follow-up tests "must be <u>unannounced</u>" and the employee "<u>cannot</u> . . . know anything about [the employer's] plan for follow-up testing.").  If SEPTA had agreed, at Taylor's insistence, to schedule follow-up tests outside of Ramadan, Taylor necessarily would have had "advance notice" of when the tests were to occur.

Taylor argues that SEPTA nevertheless would not have suffered an undue burden by scheduling the tests outside of Ramadan because it "could have complied with the follow-up testing schedule provided by the SAP without violating Mr. Taylor's religious beliefs or incurring costs."  (Doc. No. 18 at 30.)  But even if SEPTA could have complied with the SAP's testing schedule by scheduling the tests before Ramadan began in March 2023 and after it ended in April 2023, that would not resolve SEPTA's concerns that doing so would violate the text of the regulations because the tests would no longer be truly random.

Courts in this and other Circuits have consistently held an accommodation qualifies as an undue hardship if granting it would require the employer to violate the law.  *See Bd. of Educ. for Sch. Dist. of Phila.*, 911 F.2d at 891 ("[I]t would be an undue hardship to require a school board to violate an apparently valid criminal statute, thereby exposing its administrators to criminal prosecution and the possible consequences thereof."); *Cherry*, 2009 WL 2518221, at *6 (finding undue hardship where "the Regulations require that Plaintiff, as a port facility employee, carry a

photo ID.  The Coast Guard will not waive this requirement, and therefore, Defendant may not

do so without violating the Regulations"); *see also Sutton v. Providence St. Joseph Med. Ctr.*,

192 F.3d 826, 830–31 (9th Cir. 1999) ("[C]ourts agree that an employer is not liable under Title

VII when accommodating an employee's religious beliefs would require the employer to violate

federal or state law.  This court has held that the existence of such a law establishes 'undue

hardship' (rather than prevents an employee from establishing a prima facie case)."); *Lowman v.

NVI, LLC*, 821 F. App'x 29, 32 (2d Cir. 2020) ("Because NVI's SSN disclosure policy is

mandated by federal law, NVI cannot depart from the policy to accommodate Lowman without

suffering an undue hardship."); *Weber v. Leaseway Dedicated Logs., Inc.*, 166 F.3d 1223

(Table), 1999 WL 5111, at *1 (10th Cir. 1999) ("Requiring Defendant to violate these laws in

order to accommodate Plaintiff would result in undue hardship to Defendant."); *Dennison v. Bon

Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-CV-2929 (CS), 2023 WL 3467143, at *5

(S.D.N.Y. May 15, 2023) ("Title VII cannot be used to require employers to break the law.").[27]

In the alternative, SEPTA argues that scheduling Taylor's follow-up tests in the manner

he requests would cause an undue hardship because it would compromise public safety.  If

employees in safety-sensitive positions, like Taylor, knew when they were going to be drug

tested, they could more easily avoid detection.  The Court agrees that if SEPTA declined to drug

test Muslim employees during Ramadan, it would "come at a substantial non-economic cost" for

SEPTA.  *Smith*, 2023 WL 8253025, at *6; *see also EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273

(3d Cir. 2010) (holding that "[a] religious accommodation that creates a genuine safety or

---

[27] There is no contention that the regulations lack teeth or that the DOT is lax about enforcement.
And during oral argument SEPTA's counsel explained that SEPTA is subject to auditing by the agency,
which has some control over the federal funding that SEPTA ultimately receives.  (*See* Draft H'rg Tr. at
26:14–27:1.)

security risk can undoubtedly constitute an undue hardship"); *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1975) ("[S]afety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business.  Title VII does not require that safety be subordinated to the religious beliefs of an employee.").  As the DOT recognizes, drug tests are random to "deter employees from using drugs and misusing alcohol"; they ensure that "employees know they will be tested" but "they are never quite sure when."  ODAPC, *What Employers Need to Know about DOT Drug and Alcohol Testing*, at 16 (June 2015).  And given that Taylor's requested accommodation was made in the context of follow-up drug testing—which occurs only after the employee has been marked as refusing to take a prior drug test or has had a prior positive test result—random testing seems particularly important to advancing public safety.  Accordingly, the Court finds that SEPTA has shown that Taylor's proposed accommodation of scheduling drug tests outside the month of Ramadan would cause an undue burden because it would negatively affect public safety.  *See Smith*, 2023 WL 8253025, at *6 (finding that the plaintiff's proposed accommodation—that he be exempted from fire department's restriction on facial hair—would have worked "an undue hardship," because it would mean the plaintiff would "never be able to don [a safety mask] without creating a substantial risk to himself and, by extension his fellow firefighters," which would have, in turn, led to "restriction on manpower [that] would also jeopardize the safety of the general public").

The Court cannot say the same, however, for Taylor's suggestion that SEPTA could have accommodated him by scheduling his follow-up tests at the beginning of his shifts on March 23 and April 11, 2023.  On both days, his shift began before sunrise.  SEPTA has not shown that this requested accommodation would have conflicted with the regulations as they existed at the

time or created a threat to public safety.  To the contrary, the agency's email response to Brown's inquiries in 2022, encourages SEPTA to "attempt to schedule tests . . . outside of the times of the day when fasting is a requirement (sunrise to sunset)."  (Doc. No. 40-15 at 2.)[28] And SEPTA offered this exact accommodation to Taylor after Ramadan 2023.  (*See* Draft H'rg Tr. at 22:15–25; *id.* at 25:20–25 ("[I]n upcoming Ramadans . . . we'll make sure if he's pulled for random . . . we'll make sure that it's at the start of his shift.").)[29]

*     *     *

In sum, because SEPTA could have, without undue hardship, accommodated Taylor by scheduling his follow-up drug tests before sunrise when those tests occurred during Ramadan 2023, summary judgment is granted as to Taylor on this portion of his Title VII claim.[30] Summary judgment is granted in SEPTA's favor on Taylor's Title VII claims related to his random drug test during Ramadan 2022 and as to all of Taylor's PHRA claims.

## B.     First Amendment Violation under § 1983

Next, the Court addresses Taylor's claim that SEPTA violated his rights under the Free

---

[28] That email also proposed that the employer "schedule tests (if possible) outside of Ramadan (1 month)."  (Doc. No. 40-15 at 2.)  As the Court notes, however, such an accommodation was not "possible," because it would have placed SEPTA in violation of the regulations' clear text and pose an unreasonable threat to public safety.

[29] During oral argument, SEPTA's counsel argued that "SEPTA had no idea that" a change in the time that Taylor was called for testing "is something he wanted before 2022 or 2023."  (Draft H'rg Tr. at 23:14–25.)  But, as the Court has already explained, by the time the follow-up tests occurred in March and April 2023, SEPTA knew that Taylor perceived a conflict between his religious belief and the drug testing requirements.  At that point, SEPTA should have begun the interactive process and worked with Taylor to find an appropriate accommodation, which could have included the accommodation it ultimately granted.

[30] Because there is no genuine dispute of fact from which the Court can find that it would have caused an undue hardship for SEPTA to schedule Taylor's follow-up tests before sunrise during Ramadan 2023, summary judgment is appropriately entered in Taylor's favor.  *See EEOC v. Jetstream Ground Servs., Inc.*, 134 F. Supp. 3d 1298, 1336 (D. Col. 2015) (finding no "genuine factual dispute as to whether an accommodation allowing cabin cleaners to wear hijabs if they are tucked in to a shirt and secured to the head . . . constituted an 'undue hardship.'  Accordingly, summary judgment will be entered in Plaintiff's favor with respect to the hijab accommodation" (citations omitted)).

Exercise Clause of the First Amendment.  (*See* Doc. No. 5 at 17.)  He brings this claim pursuant to 42 U.S.C. § 1983, which states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.  "[T]o state a claim under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States, and second, that the alleged deprivation was committed or caused by a person acting under color of state law." *Jenkins v. Cordova*, Civ. No. 22-6482 (KM) (CLW), 2023 U.S. Dist. LEXIS 84428, *9 (D.N.J. May 15, 2023) (citing *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011)).  SEPTA does not dispute that as a regional public transit authority, it is an instrumentality of the Commonwealth of Pennsylvania, and therefore, acts under color of state law when implementing its employment policies.  (*See* Doc. No. 38 at ¶ 3.)  Accordingly, the only issue in this litigation is whether SEPTA violated Taylor's rights under the First Amendment's Free Exercise Clause.

That Clause states:  "Congress shall make no law . . . prohibiting the free exercise [of religion]."  U.S. Cons. amend. I.  "The 'free exercise of religion' includes not only 'the right to believe and profess whatever religious doctrine one desires,' but also the right to act and abstain from acts for religious reasons." *Spivack v. City of Philadelphia*, 649 F. Supp. 3d 45, 54–55 (E.D. Pa. 2023) (quoting *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 877 (1990)).  Here, there can be no real dispute that the drug testing requirements burdened Taylor's ability to exercise his religious beliefs because they required him to choose between providing a urine sample at risk of losing his job and fasting for Ramadan.  *See Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021) ("As an initial matter, it is plain that the City's actions have burdened CSS's religious exercise by putting it to the choice of curtailing its mission or

approving relationships inconsistent with its beliefs."). "Not all laws that burden this right

offend the Constitution, however." *Spivack*, 649 F. Supp. 3d at 54–55; *see also Fulton*, 593 U.S.

at 532–33 ("Our job is to decide whether the burden the City has placed on the religious exercise

of CSS is constitutionally permissible."); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,

508 U.S. 520, 531 (1993) ("[A] law that is neutral and of general applicability need not be

justified by a compelling government interest even if the law has the incidental affect of

burdening a particular religious practice."). Nor are they all subject to the same level of

constitutional review. *Spivack*, 649 F. Supp. 3d at 54–55.

### 1.   <u>Appropriate Level of Scrutiny</u>

"Depending on the nature of the challenged law or government action, a free exercise

claim" in the public employer context can trigger strict scrutiny, intermediate scrutiny, or

rational basis review. *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 & n.24

(3d Cir. 2002). First, a law is subject to strict scrutiny if it lacks facial neutrality. *See Smith*,

2023 WL 8253025, at *4 ("[B]ecause the policy is facially neutral, and because Plaintiff's claims

arise in the public employment context, the choice for the Court here is between only rational

basis review and intermediate scrutiny."); *cf. Spivac*, 649 F. Supp. 3d at 55 ("Only a law that is

not neutral respecting religion or not generally applicable must pass strict scrutiny . . . ."").

Second, if enforcement of an otherwise facially neutral law or policy is "sufficiently suggestive

of discriminatory intent," or otherwise, "not generally applicable (*i.e.*, if it proscribes particular

conduct only or primarily when religiously motivated)," it is subject to intermediate scrutiny.

*Tenafly Eruv Ass'n, Inc.*, 309 F.3d at 165–66. Third, rational basis review applies when the

challenged law is "neutral," "generally applicable," and "burdens religious conduct only

incidentally." *Id.* at 165 & n.24; *Spivac*, 649 F. Supp. 3d at 55 ("A neutral law of general

applicability is subject only to rational basis review, even if it incidentally burdens a religious

practice.").

As this overview suggests, to determine the appropriate standard, a court must first consider whether the challenged law or policy is "neutral" and "generally applicable." *See Spivack*, 649 F. Supp. 3d at 55. "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531.

a.   <u>Neutrality</u>

Beginning with neutrality, a law or policy is not neutral if "it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533; *see also Lukumi*, 508 U.S. at 532 ("[T]he First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general."). "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Id.* at 532–33. "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Id.* at 533.

"To determine the object of a law," the court begins "with the text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Id.* "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.*; *see also Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877–78 (1990) ("[A] state would be 'prohibiting the free exercise of religion' if it sought to ban such acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display. It would doubtless be unconstitutional, for example, to ban the casting of 'statutes that are to be used for worship purposes,' or to prohibit bowing down before a golden calf."). Here, Taylor concedes the DOT regulations and SEPTA

policies are facially neutral.  (Draft H'rg Tr. at 56:16–18.)

"Facial neutrality is not determinative," however, because the "Free Exercise Clause . . . extends beyond facial discrimination."  *Lukumi*, 508 U.S. at 534; *Spivack*, 649 F. Supp. 3d at 55 ("A facially neutral law may nonetheless infringe neutrality if it 'targets religious conduct for distinctive treatment.'"); *see also Tenafly Eruv Ass'n, Inc.*, 309 F.3d at 165–66 (discussing *Lukumi* and explaining that "in situations where government officials exercise discretion in applying a facially neutral law, so that whether they enforce the law depends on their evaluation of the reasons underlying a violator's conduct, they contravene the neutrality requirement if they exempt some secularly motivated conduct but no comparable religiously motivated conduct.").  Accordingly, the court must look beyond the text to determine whether religious suppression was the object of the law.  *Lukumi*, 508 U.S. at 534.

This analysis requires consideration of the practical effect of the challenged law or policy.  For example, the *Lukumi* court considered the effect of the challenged ordinances and noted that "almost the only conduct subject to [the ordinances] is the religious exercise of Santeria church members" and the historical texts confirmed that the ordinances "were drafted in tandem to achieve this result."  *Id.* at 535–36.  Likewise, when the government agency selectively enforces a facially neutral law that could have greater applicability, courts have found that the law ultimately lacks neutrality.  For example, in *Tenafly Eruv. Ass'n, Inc.*, the Third Circuit considered a municipal ordinance that prohibited citizens from affixing anything to utility poles.  309 F.3d at 167.  Although the ordinance was "neutral and generally applicable on its face," the municipality had not enforced it uniformly, allowing "drab house numbers and lost animal signs" along with "more obtrusive holiday displays, church directional signs, and orange ribbons" to be affixed to utility poles but rejecting Jewish residents' request to hang *lechis* on

those same poles.  *Id.*  The Third Circuit concluded that the municipality's "selective, discretionary application of Ordinance 691 against *lechis* violate[d] the neutrality principle . . . because it 'devalue[d]' Orthodox Jewish reasons for posting items on utility poles by 'judging them to be of lesser import than nonreligious reasons.'"  *Id.* (quoting *Lukumi*, 508 U.S. at 537).

Unlike the laws in *Lukumi* and *Tenafly*, here, there is no indication that the SEPTA's testing policies apply only to religious conduct or that they are enforced in a non-neutral fashion. To the contrary, the policies—and the regulations and official guidance from the DOT on which the policies are based—show that the testing procedures were promulgated to comply with federal law and ultimately, advance interests of public safety by ensuring operators of heavy machinery, commercial vehicles, and public transportation are not inebriated while at work.  And they are uniformly applied to all SEPTA employees working safety-sensitive positions to ensure that purpose is met.  *See Smith*, 2023 WL 8253025, at *4 ("The policy is also enforced on a religion-neutral basis.  Plaintiff does not dispute that a fellow firefighter's request for a medical non-religious exemption to the grooming policy was denied, and has presented no evidence that the policy is enforced inconsistently or in any way other than on a religion-neutral basis.  The grooming policy appears to have no motivation beyond safety and does not target religious conduct." (cleaned up)). *cf. Lukumi*, 509 U.S. at 535–40 ("In sum, the neutrality inquiry leads to one conclusion:  The ordinances had as their object the suppression of religion.  The pattern we have recited discloses animosity to Santeria adherents and their religious practices; the ordinances by their own terms target this religious exercise; the texts of the ordinances were gerrymandered with care to proscribe religious killings of animals but to exclude almost all secular killings; and the ordinances suppress much more religious conduct than is necessary in order to achieve the legitimate ends asserted in their defense.  These ordinances are not

neutral . . . .").

Because the object of SEPTA's policies is not the suppression of religion, the Court finds

that they are neutral.

b.    <u>General Applicability</u>

That leaves general applicability.  A law or policy is not "generally applicable" if "it

proscribes particular conduct only or primarily when religiously motivated."  *Tenafly Eruv Ass'n,*

*Inc.*, 309 F.3d at 166.  The Supreme Court has recognized two ways in which a given law can be

found to lack general applicability.

First, a law is not generally applicable "if it prohibits religious conduct while permitting

secular conduct that undermines the government's interests in a similar way."  *Fulton*, 593 U.S.

at 533; *see also Lukumi*, 508 F.3d at 542–43 ("[The Free Exercise Clause] protects religious

observers against unequal treatment, and inequality results when a legislature decides that the

governmental interests it seeks to advance are worthy of being pursued only against conduct with

a religious motivation.").  For example, in *Lukumi*, the Supreme Court considered municipal

ordinances that prohibited animal sacrifice.  *Lukumi*, 508 F.3d at 543.  The ordinances purported

to "advance two interests: protecting the public health and preventing cruelty to animals," but

they were substantially "underinclusive for those ends."  *Id.*  Of note, the ordinances did not

"prohibit nonreligious conduct," including hunting, pest extermination, and restaurant disposal of

food waste, "that endanger[ed] these interests in a similar or greater degree than Santeria

sacrifice does."  *Id.* at 543–46.  Given this underinclusiveness, the Court found that they were not

generally applicable.

Second, "[a] law is not generally applicable if it invites the government to consider the

particular reasons for a person's conduct by providing a mechanism for individualized

exemptions."  *Fulton*, 593 U.S. at 533; *see also Sherbert v. Verner*, 374 U.S. 398, 401 (1963).

65

For example, in *Sherbert*, the Supreme Court found an unemployment benefits law was not generally applicable because it required an applicant to show "good cause" as to why they were unable to "accept available suitable work." *Id.* The law was "not generally applicable because the 'good cause' standard permitted the government to grant exemptions based on the circumstances underlying each applicant." *Fulton*, 593 U.S. at 534 (discussing *Sherbert*, 374 U.S. 398); *see also id.* at 535–37 (finding a contract was not generally applicable where it included a provision prohibiting the provider from rejecting a prospective foster child or family on the basis of "sexual orientation . . . unless an exception is granted by the Commissioner . . . in his/her sole discretion").

Accordingly, to determine whether SEPTA's testing policies are generally applicable, we must consider whether those policies: (1) "prohibit[ ] religious conduct but permit[ ] comparable secular conduct," or (2) "'invite[ ] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions.'" *Spivack*, 649 F. Supp. 3d at 56 (quoting *Fulton*, 141 S. Ct. at 1877). Here, Taylor identifies three requirements, which he argues show that the drug testing policies are not generally applicable. The Court addresses each requirement in turn.

### i.       *Exemption for Employees on Vacation or Leave*

First, Taylor argues that SEPTA's policies (and by extension, the DOT regulations) impermissibly "prohibit religious conduct but permit comparable secular conduct" because they allow SEPTA to treat "employees who [a]re sick or on vacation as unavailable" when their name is selected for random testing, but do not allow for a similar exemption when an employee is unable to complete random testing for religious reasons. (Doc. No. 18 at 17.)

To determine whether two activities are "comparable for purposes of the Free Exercise Clause" the court must compare each activity "against the asserted government interest that

justifies the regulation at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).  As discussed

above, the testing requirements are meant to promote public safety by ensuring operators of

heavy machinery, commercial vehicles, and modes of public transportation are not inebriated

while at work.  *See* ODAPC, *What Employers Need to Know about DOT Drug and Alcohol

Testing*, at 16 (June 1, 2015).  To that end, the testing regulations require testing of covered

employees "anytime *while on duty*."  *See* 49 C.F.R. § 655.45(i) (emphasis added).  But an

employee who is out on vacation or extended medical leave, is not "on duty," and therefore,

exempting them from random testing does not violate the regulations or interfere with the

purpose of the testing requirements.  To this end, Brown explained during her deposition that

SEPTA employees who are on vacation or out on leave are exempted from random testing

precisely because they are not working (and therefore, not a risk to the general public) when their

name is randomly selected.  (Brown Dep. Tr. at 12:3–11.)  By contrast, granting a religious

exemption for an employee while he is on duty and working in a safety sensitive position could

threaten public safety by allowing an employee to show up to work inebriated because there is no

threat of detection.

Given each exemption's relationship to the purpose of the testing requirements, we

cannot find that they are "comparable" or that the vacation/leave exemption renders SEPTA's

testing policies not generally applicable.  *See Spivack*, 649 F. Supp. 3d at 59 ("Once again, the

medical exemption Krasner finally approved was for an objectively and narrowly defined

category of persons:  non-union DAO employees for whom a vaccination could be life-

threatening.  This is not the kind of exemption that undermines the Policy's general

applicability."); *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d

359, 366 (3d Cir. 1999) (discussing the police department's "no-beard" policy and explaining

that the exception for undercover officers did not undermine the department's interest in uniformity in the same way that allowing a medical exception and religious exception for on duty cops would).

      *ii.*    *SEPTA's Discretion to Determine a "Refusal to Test"*

Second, Taylor argues that SEPTA's testing policies are not generally applicable because they are based on DOT regulations that "provid[e] a mechanism for individualized exemptions," which invites "the government to consider the particular reasons for a person's conduct.'" *Spivack*, 649 F. Supp. 3d at 56 (quoting *Fulton*, 141 S. Ct. at 1877). For this argument, Taylor relies on § 40.191(d)(1)—which states an "employer has a non-delegable duty to make the decision about whether the employee has refused to test"—and a written explanation issued by the agency when it promulgated the most recent version of that regulation—which identifies multiple scenarios (including a family emergency and the early closure of the testing facility) on which a DER can rely to mark a cancelled test as an administrative "non-event" instead of a refusal to test. (Doc. No. 18 at 17–22.)

This argument fails for the same reason that it failed in connection with Taylor's Title VII claim: the portion of § 40.191(d)(1) on which Taylor relies and the accompanying agency discussion were not issued until *after* Taylor's drug tests in 2022 and 2023. Because neither the regulations in effect at the relevant time nor SEPTA's policies authorized a DER to mark a cancelled test as an administrative "non-event," Taylor has not shown that the testing procedures are anything but generally applicable. *See Smith*, 2023 WL 8253025, at *5 ("By denying *all* requests for exemption, Defendants have not engaged in any evaluation of the reasons underlying a violator's conduct, which would require application of intermediate scrutiny." (quotation marks omitted)).

### iii.    SEPTA's Discretion to Discipline

Last, Taylor argues that the testing procedures are not generally applicable because SEPTA retained "discretion regarding the disciplinary measures" that are to be implemented when an employee is marked as refusing to test.  (Doc. No. 18 at 22–23.)  Specifically, Taylor takes issue with SEPTA's decision to suspend him without pay after he was found to have refused to test on April 6, 2022.  (Doc. No. 18 at 22–23.)  But Taylor has not shown that SEPTA imposes discipline in a way that burdens religious conduct while providing less punitive sanctions for comparable secular conduct.  In fact, Taylor has identified nothing in the record to suggest that SEPTA's policies give managers the discretion to consider "the particular reasons" why an employee received a non-negative test result.[31]  (*See* Doc. No. 40-7, Ex. 1 at pp. 35–36 (SEPTA's Drug Free Workplace Program Manual, which outlines the consequences of a positive test result).)

Accordingly, the Court cannot find that the DOT regulations or SEPTA's policy of suspending employees without pay until they complete the SAP process lack general applicability.

---

[31] To the extent Taylor argues that the *DOT regulations* lack general applicability because they give discretion to employers to discipline employees who violate the testing regulations, that argument also fails.  For one, it is not enough to say that a challenged regulation leaves some responsibilities to the government employer's discretion.  Indeed, if that were enough to strip the law of its general applicability, it is hard to imagine any law that would survive scrutiny.  Moreover, in this case, the Court questions the extent to which the regulations give discretion to employers.  The regulations unequivocally state that when an employee receives a non-negative test result, the employer *must* have the employee "removed from safety sensitive duties until they have completed the return to duty process."  49 C.F.R. § 40.23.  This return to duty process, includes "the SAP evaluation, referral, and education/treatment process" set out in the DOT agency regulations.  49 C.F.R. § 40.285(a) (prohibiting an employee from "perform[ing] any DOT safety-sensitive duties for any employer until and unless" they complete this process); *id.* § 40.289(b) (explaining that if an employer offers the employee "an opportunity to return to a DOT safety-sensitive duty following a violation, [the employer] *must*, before the employee again performs that duty, ensure that the employee receives an evaluation by a[n] SAP meeting . . . and that the employee successfully complies with the SAP's evaluation recommendations").  Taylor's own suspension, which lasted only as long as the SAP evaluation, referral, and education/treatment process, complied with that requirement.

\*       \*       \*

In sum, SEPTA policies governing random and follow-up drug tests are neutral and generally applicable. Accordingly, the relevant level of scrutiny is rational basis review. *Tenafly Eruv Ass'n, Inc.*, 309 F.3d at 165 & n.24.

### 2.       Rational Basis Review

"[R]ational basis review requires merely that the action be rationally related to a legitimate government objective." *Tenafly Eruv Ass'n, Inc.*, 309 F.3d at n.24; *see also Smith*, 2023 WL 8253025, at \*5 ("As Plaintiff's arguments for heightened scrutiny are unavailing, his free exercise claims are subject to rational basis review, which requires that the grooming policy be rationally related to a legitimate government objective." (quotation marks omitted)). Here, the SEPTA's testing procedures advance the government's legitimate objective in protecting public safety by ensuring operators of heavy machinery, commercial vehicles, and modes of public transportation are not inebriated while on duty. "Safety is a well-recognized legitimate government objective." *Smith*, 2023 WL 8253025, at \*6. And just like the DOT regulations, SEPTA's policies are rationally related to that objective. By requiring random drug tests that apply to all employees without warning, the testing procedure "deter[s] employees from using drugs and misusing alcohol" because "employees know they will be tested" but "they are never quite sure when." ODAPC, *What Employers Need to Know about DOT Drug and Alcohol Testing*, at 16 (June 2015). Likewise, once an employee has received a non-negative test result, it is reasonable to assume that he may present an increased threat to the public safety. To that end, the follow-up testing procedures ensure that the employee retains a negative test result before he is able to resume safety-sensitive operations and in the months afterward, ensure no more non-negative results occur.

Because SEPTA's policies are "rationally related to the government's legitimate

objectives, it survives rational basis review." *Smith*, 2023 WL 8253025, at *6. Although the testing requirements may have incidentally burdened Taylor's religious beliefs, "the Free Exercise Clause 'offers no protection' in such circumstance and [his] free exercise claim necessarily fails." *Id.* (quoting *Tenafly Eruv Ass'n, Inc.*, 309 F.3d at 165). Accordingly, SEPTA is entitled to summary judgment on Taylor's First Amendment claim.

## V.     CONCLUSION

SEPTA's motion for summary judgment is denied to the extent Taylor states a Title VII failure to accommodate claim in connection with follow-up testing during Ramadan 2023. The remainder of the motion is granted. Taylor's motion for summary judgment is granted to the extent Taylor states a Title VII failure to accommodate claim in connection with follow-up testing during Ramadan 2023. The remainder of his motion is denied. An appropriate order follows.