**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JEREMI TAYLOR**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 23-2140-KSM** |
| **THE SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY (SEPTA),** | |
| Defendant. | |

## <u>MEMORANDUM</u>

**MARSTON, J.**                                                                                      **June 27, 2024**

Plaintiff Jeremi Taylor is a practicing Muslim who works as a construction equipment operator for Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA"). In this lawsuit, he contends that SEPTA violated his First Amendment rights and various state and federal discrimination statutes when it insisted that he drink water during Ramadan so that he could provide a urine sample for mandatory drug testing. (Doc. No. 5.) To support his claims, Taylor intends to use the expert testimony of Thomas C. Econome as evidence that under the applicable federal regulations, SEPTA had discretion to reschedule Taylor's drug test or, at minimum, to avoid marking Taylor as having "refused" to take the test when he was unable to produce a sufficient urine sample. (*See* Doc. No. 26-1 (Econome's expert report).) SEPTA has moved to strike Econome's expert testimony as providing impermissible legal opinions, or in the alternative, as inadmissible under the standard outlined in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (*See* Doc. No. 25.) For the reasons discussed below, SEPTA's motion is granted in part and denied in part.

## I.      BACKGROUND

The facts underlying this case are set out more fully in the contemporaneously filed Memorandum ruling on the parties' cross-motions for summary judgment.  Because the Court writes primarily for the parties, we do not repeat those facts at length in this Memorandum, and instead, include only a brief overview of the drug testing framework, Taylor's claims, and the contents of Econome's expert report and deposition.

### A.      Regulatory Drug Testing Requirements

As a public transportation service provider and recipient of federal funding, SEPTA must comply with the safety regulations issued by the DOT's Federal Transit Administration.  *See* 49 C.F.R. §§ 40.1, 655.3, 655.4.  These regulations include drug and alcohol testing requirements for employees, like Taylor, who perform safety-sensitive functions.  *Id.* §§ 655.4, 655.21.  The relevant regulations are contained in 49 C.F.R. Part 40.  *See id.* § 401(a), (b).

### 1.      <u>Procedures for Random Testing</u>

Under Part 40, SEPTA is required to conduct random drug tests pursuant to a written testing plan.  *Id.* § 655.21; *see also id.* §§ 655.12, 655.15 (effective through May 31, 2023).[1] SEPTA conducts random tests on a weekly basis that runs from Sunday to Saturday with tests occurring at various times each day.  (Doc. No. 40-2 at ¶ 9; Brown Dep. Tr. at 11:12–15 (testifying that SEPTA conducts tests "24/7"); *id.* at 23: 3–11).  In preparation for those tests, SEPTA uses an outside vendor to generate a random list of approximately 100 employee names, which is sent to SEPTA's Drug and Alcohol Program Manager, Paula Brown, the Thursday before the testing week begins.  (Doc. No. 40-2 at ¶¶ 10–11; Doc. No. 40-14 at ¶ 26; Erinoff Dep. Tr. at 16:3–8; Brown Dep. Tr. at 12:3–13:9.)  Brown "distribute[s] the selections . . . evenly

---

[1] For purposes of this Memorandum, the Court relies on the versions of the regulations that were in effect in 2022 and 2023 when Taylor claims SEPTA discriminated against it.

throughout the week," and "at about 3:00 a.m. in the morning" before the selected employee's

shift, program staff members "start calling people to come in for their testing" either in "the

beginning, middle, or end of their shift."  (Brown Dep. Tr. at 12:3–11); *see also* 49 C.F.R.

§ 655.45(i) ("A covered employee may be randomly selected for prohibited drug use anytime

while on duty.").  When an employee is notified that they have been selected for testing, "he or

she <u>must proceed immediately</u> to the collection site."  ODAPC, *What Employers Need to Know*

*about DOT Drug and Alcohol Testing*, at 19 (June 2015) (explaining that this ensures the

"integrity of the testing process"); *see also* 49 C.F.R. § 655.45(h) ("Each employer shall require

that each covered employee who is notified of selection for random drug or random alcohol

testing proceed to the test site immediately.").  Anybody that is "not tested within [the one week]

period," because, for example, they are "sick or on vacation," and therefore, not working at the

relevant time, is "excused" from testing.  (Brown Dep. Tr. at 12:3–11.)

### 2.     Collecting a Urine Sample and the Shy Bladder Procedures

When the employee arrives at the collection site, they are to be given a sealed collection

container, directed to a restroom, and told to "provide a specimen of at least 45 mL, not flush the

toilet, and return to [the service agent] with the specimen."  49 C.F.R. § 40.63(d) (effective Oct.

1, 2010 to May 31, 2023).  The collector then inspects the sample, ensuring it "contains at least

45 mL of urine," falls within an acceptable temperature range, and does not show any signs of

tampering.  *Id.* § 40.65(a) (effective through May 31, 2023).  If the sample is less than 45 mL,

the collector is required to "discard the original specimen" and begin the "'shy bladder'

procedures" outlined in the regulations.  *Id.*; *see also* ODAPC, *DOT Urine Specimen Collection*

*Guidelines*, at 20 (Jan. 2018) ("If the employee provided an initial insufficient specimen, the

collector discards the insufficient specimen . . . .  This is the time when the 'shy bladder'

collection process starts.").

Under those procedures, the collector must give the employee another opportunity to provide a sufficient specimen and should encourage the "employee to drink up to 40 ounces of fluid, distributed reasonably through a period of up to three hours." *Id.* § 40.193(a), (b)(1)(ii) (effective Jan. 1, 2018 to May 31, 2023). "It is not a refusal to test if the employee declines to drink." *Id.*; *accord* ODAPC, *DOT Urine Specimen Collection Guidelines*, at 21 (Jan. 2018). It is, however, considered a refusal if the employee is unable to provide a sufficient sample during the three-hour period *and* there is no medical reason for this failure. Notably, the regulations state that "[i]f the employee has not provided a sufficient specimen within three hours of the first unsuccessful attempt to provide the specimen," the collector "must discontinue the collection, note the facts" on the collection form, and "immediately notify" the employer's designated employee representative ("DER").[2]  49 C.F.R. § 40.193(b)(1)(iv) (effective Jan. 1, 2018 to May 31, 2023).

Once notified, the DER "*must*" consult with the designated medical review officer ("MRO")[3] and "direct the employee to obtain, within five days, an evaluation from a licensed physician, acceptable to the MRO, who has expertise in the medical issues raised by the employee's failure to provide a . . . sufficient specimen." *Id.* § 40.193(c) (effective Jan. 1, 2018 to May 31, 2023). If the physician determines that "[t]here is not an adequate basis for determining that a medical condition has, or with a high degree of probability could have, precluded the employee from providing a sufficient amount of specimen," the MRO reviews the

---

[2] The DER is the "employee authorized by the employer to take immediate action(s) to remove employees from safety-sensitive duties . . . and to make required decisions in the testing and evaluation processes." 49 C.F.R. § 40.3 (effective Jan. 1, 2018 to May 31, 2023). Paula Brown is the DER for SEPTA. (Brown Dep. Tr. at 23:7–20.)

[3] The MRO is the "licensed physician[,] who is responsible for receiving and reviewing laboratory results generated by an employer's drug testing program and evaluating medical explanations for certain drug test results." 49 C.F.R. § 40.3 (effective Jan. 1, 2018 to May 31, 2023).

physician's findings and if they agree, the MRO "must" mark the employee as having "refus[ed] to test."  49 C.F.R. § 40.193(d)(2) (effective Jan. 1, 2018 to May 31, 2023); *see also id.* § 40.191(a)(5) (effective Oct. 1, 2010 to May 31, 2023) (An employee "refuse[s] to take a drug test" when they "[f]ail to provide a sufficient amount of urine when directed, and it has been determined, through a required medical evaluation, that there was no adequate medical explanation for the failure.").  "An MRO's refusal determination is final and not subject to [employer] review."  ODAPC, *What Employers Need to Know about DOT Drug and Alcohol Testing*, at 28 (June 2015).

### 3.    Consequences of Refusing to Test

When an employee is marked as refusing to submit to a random or follow-up drug test, they are prohibited from returning to work in a position requiring a safety-sensitive function until they "meet[ ] the requirements of 49 CFR Part 40 for returning to duty."  49 C.F.R. § 655.61(b) (effective through May 31, 2023); *accord id.* §§ 655.49(a), 655.61(a)(3) (effective through May 31, 2023).  The first step in that process is to submit to an evaluation with a substance abuse professional ("SAP") and complete any education courses or treatment requirements recommended by the SAP.  *Id.* §§ 40.285 (effective through May 31, 2023), 40.293 (effective through May 31, 2023).  Once the employee complies with the recommended course of education or treatment, they are reevaluated by the SAP, who provides a written report to the DER highlighting the employee's compliance.  *Id.* § 40.301(c)(1) (effective through May 31, 2023).

If at that point the employer wishes for the employee to "return to the performance of safety-sensitive functions," the employee takes a return-to-duty drug test.  *Id.* § 40.305(a) (effective through May 31, 2023).  "The employee must have a negative drug test result . . . before resuming performance of safety-sensitive duties."  *Id.*  In addition, after returning to duty,

the employee must complete follow-up testing as directed by the SAP.  ODAPC, *What Employers Need to Know about DOT Drug and Alcohol Testing*, at 18 (June 2015) ("[T]he SAP can direct more tests and may extend them for up to five years.").

### B.      Taylor's Drug Tests

Taylor has been subject to drug testing under these regulations and SEPTA's corresponding policies several times.  As relevant here, he was called for random drug testing during daylight hours on April 6, 2011.  (Doc. No. 40-2 at ¶ 55.)  When he was unable to produce a sufficient amount of urine as a sample, the technicians began the shy bladder procedure and encouraged Taylor to drink water so that he could provide a second sample.  (Doc. No. 40-4 at ¶¶ 32–38.)  At first, he refused to drink water because he was fasting for Ramadan, but when he was told he would be marked as having refused to test if he failed to provide a second sample, Taylor reluctantly agreed to drink water.  (*Id.* at ¶¶ 44–45.)  Despite doing so, he was unable to provide another sample within the required time frame, and when the MRO found his failure was not for medical reasons, he was marked as refusing to test.  (*Id.* at ¶¶ 45, 48, 60; *see also* Taylor Dep. Tr. at 126:17–131:22.)

This triggered the SAP evaluation process, and when Taylor returned to work, resulted in Taylor having to take follow-up tests at various times over the next five years.  (Doc. No. 40-4 at ¶ 55; Doc. No. 40-23 (referral to SAP, signed by Taylor, who added, "I do not agree to this"); Doc. No. 40-22 (SAP Follow Up Evaluation).)  Two follow-up tests, one in March 2023 and a second in April 2023, were during Ramadan.  (Doc. No. 40-4 at ¶ 77.)  Knowing he would be immediately discharged if he was marked as refusing a second test, Taylor drank water during each follow-up test to ensure he could produce a sufficient urine sample.  (*Id.* at ¶ 78.)

### C.      Taylor's Complaint

Taylor filed this action against SEPTA on June 5, 2023.  (*See* Doc. No. 1.)  A few weeks

later, he filed an Amended Complaint, which is the operative pleading.  (*See* Doc. No. 5.)  He brings one claim pursuant to 42 U.S.C. § 1983, contending that SEPTA violated his First Amendment rights when it "coerced [him] into drinking water in violation of his Ramadan fast in both 2022 and 2023" and when it refused "to exercise its discretion and enforce DOT regulations in a nondiscriminatory manner by allowing Mr. Taylor to appear for his drug tests outside of fasting hours during Ramadan or during one of the eleven (11) other months of the year."  (Doc. No. 5 at 17.)  Taylor also claims that SEPTA's conduct amounts to religious discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act ("PHRA").  (*Id.* at 18–20.)

> ### D. Econome's Expert Report

In support of his claims, Taylor has produced the expert report of Thomas C. Econome. (*See* Doc. No. 26-1.)  Econome is the President and General Manager of Collection Plus, a company that serves as a third-party administrator for other businesses' drug and alcohol testing needs.  (*Id.* at ¶¶ 7–8.)  In that role, Collection Plus has provided drug and alcohol testing and collection services in California since 2004, seeing more than 900 employees per month, and it offers consultation services to its clients, providing "advice and counsel as needed for meeting compliance standards under 49 CFR Part 40."  (*Id.*)  Collection Plus also manages shy bladder determinations and follow-up testing programs for its clients.  (*Id.* at ¶ 9.)  Econome himself is a certified substance abuse program administrator (C-SAPA), and he is an active member of the Substance Abuse Program Administration Association (SAPAA).  (*Id.* at ¶ 11.)

In this case, Taylor asked Econome to "render opinions in the areas of [a]dministering a DOT random testing and follow up program as well as to review the particular procedures to be utilized when a donor is unable to provide a urine specimen of at least 45 mL."  (*Id.* at ¶ 16.)  In forming his opinions, Econome considered the depositions taken in this case, along with the

relevant regulations and guidelines.  (*Id.* at ¶ 18.)  His report, which is dated December 14, 2023, includes two overall opinions.

The first opinion relates to the discretion that Part 40 affords employers and DERs during the random testing process:

> **Opinion #1**—It is [his] opinion that the regulations are not to be followed "blindly" and a [DER] in any situation, other than certain MRO reports, has discretion as to when to cancel, delay, or postpone a drug test and how to handle any rescheduling of a drug and/or alcohol test. In addition, the DER has authority, even in the middle of testing, to exercise discretion to stop the process on reasonable grounds and to administratively close the procedure, essentially treating the test as a "non-event."

(*Id.* at ¶ 24.)  In support of this general opinion, he goes on to make five specific "points":

> 1. The DOT regulations require the DER to determine whether a violation of the regulations has taken place but permit the DER to exercise discretion in making that determination.
>
> 2. SEPTA's DER had the ability to accommodate Mr. Taylor's objection to breaking his fast by drinking water during Ramadan.
>
> 3. The DER had discretion to cancel or postpone Mr. Taylor's scheduled test.
>
> 4. Once the process has started, the DER still has discretion to stop the process.
>
> 5. Even after the SAP process was started the DER could have cancelled that process and reinstated the employee, because more information was found after the fact.

(*Id.* at pp. 9–18.)

Econome's second opinion relates to the discretion that the regulations give employers during follow-up testing:

> **Opinion #2**—It is [his] opinion that when administering [f]ollow-[u]p testing there is even more discretion and flexibility in how to implement Part 40 regulations.

(*Id.* at ¶ 24.)  There are no subparts to this opinion, but Econome concludes that "SEPTA's DER

had discretion to schedule follow-up testing on dates in March and April of 2023 other than

during Ramadan." (*Id.* at p. 19.)

### E.      Econome's Deposition

After reviewing Econome's expert report, SEPTA took his deposition on February 15,

2024, around two weeks shy of the expert discovery deadline.  (*See* Doc. No. 22 at ¶ 2.)  During

that deposition, he reiterated the opinions contained in his expert report.  He also built on his

prior opinions by providing additional background information about drug testing under the

regulatory framework.  Notably, he discussed the typical custom in the industry for selecting

employees for random testing, the protocols in place if an employee fails a drug test, and the

common practice used for scheduling follow-up tests.  (Econome Dep. Tr. at 43:21–55:7,

149:21–150:11, 191:19–193:13; *see also id.* at 74:6–16 (Econome testifying to his "interactions

with MROs" and "other industry trade association professionals" about the requirement that a

collector offer the employee water after they are unable to produce a sufficient sample).)

## II.      DISCUSSION

SEPTA moves to disqualify Econome from offering his expert opinions, arguing that

they should be excluded because each "opinion is purely a legal conclusion about how *he* thinks

49 C.F.R. § 40 should be interpreted."  (Doc. No. 26 at 10.)  In the alternative, SEPTA argues

that Econome's opinions are inadmissible under Federal Rule of Evidence 702 and the Supreme

Court's holding in *Daubert*.  (*Id.* at 20–22.)  Taylor opposes the motion, arguing that Econome is

both qualified and permitted to "render opinions upon the practice and custom of those in the

field conducting drug testing under the Department of Transportation's regulations."  (Doc. No.

39 at 10.)  Taylor also argues that to the extent Econome testified during his deposition about

industry custom and practice, that testimony is admissible.  (*See* Doc. No. 50 at 2.[4])  SEPTA

disagrees, arguing that any opinions raised for the first time during Econome's deposition are

inadmissible because they were not included in his expert report as required by Federal Rule of

Civil Procedure 26(a)(2)(B).

The Court first addresses whether the expert opinions in Econome's expert report are

impermissible legal conclusions, and then considers whether Econome may rely on additional

opinions that were given during his deposition but excluded from the report.  Finally, to the

extent any of Econome's opinions remain, the Court considers those opinions under the

framework outlined in Rule 702 and *Daubert*.

### A.    Impermissible Legal Conclusions

A district court has "discretion to determine whether expert testimony will help the trier

of fact" in a given case.  *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006).

In exercising that discretion, however, "the District Court must ensure that an expert does not

testify as to the governing law of the case."  *Id.*  Indeed, although Federal Rule of Evidence 704

permits expert opinions that "embrace[ ] an ultimate issue to be decided by the trier of fact, an

expert witness is prohibited from rendering a legal opinion" because "[s]uch testimony . . . would

usurp the District Court's pivotal role in explaining the law to the jury."  *Id.* (quotation marks

omitted); *see also FedEx Ground Package Sys., Inc. v. Applications Int'l Corp.*, 695 F. Supp. 2d

216, 221 (W.D. Pa. 2010) ("It is the duty of the court, not of any witness, to explain the law to

the jury.").

---

[4] This argument appears in a supplemental brief that Taylor submitted after oral argument.  At no point did the Court request additional briefing on this issue or give Taylor leave to file additional pages in support of his arguments.  As such, the Court would have considered a motion to strike this filing from the Docket.  Nevertheless, because SEPTA has not moved to strike the erroneous filing, and the brief addresses issues raised at oral argument, the Court will consider the arguments raised within it.

Here, the opinions in Econome's expert report do just that.  In his two general opinions, Econome purports to interpret the regulations contained in Part 40 and offers a legal conclusion about the scope of discretion that those regulations afford employers like SEPTA.  (*See* Doc. No. 26-1 at ¶ 24 (framing his first opinion as "a [DER] in any situation . . . *has discretion* as to when to cancel, delay, or postpone a drug test and how to handle any rescheduling of a drug and/or alcohol test.  In addition, the DER *has authority*, even in the middle of testing, *to exercise discretion* to stop the process on reasonable grounds and to administratively close the procedure, essentially treating the test as a "non-event" (emphases added)); *id.* (framing his second opinion as "when administering [f]ollow-[u]p testing there is *even more discretion* and flexibility in how to implement Part 40 regulations" (emphasis added)).

This conclusion is reinforced by the discussion following each opinion in his report.  Of note, the first point that Econome makes under his first opinion is that "DOT regulations *require* the DER to determine whether a violation of the regulations has taken place but *permit* the DER to exercise discretion in making that determination."  (*Id.* at p. 9 (emphases added).)  This is clearly a conclusion about the meaning and scope of the regulations.  Indeed, in support of this point, Econome relies solely on the regulations, quoting multiple portions of Part 40.  (*Id.* at ¶¶ 25–29 (quoting 49 C.F.R. §§ 40.5, 40.7, 40.11, 40.355(g)–(k), (o), 40.193(b)(iii)).)[5]  And in his deposition, Econome confirmed that this portion of the report outlines his "interpretation . . . [of] what th[e] regulation means."  (Econome Dep. Tr. at 133:3–12.)  Indeed, during his deposition Econome confirmed that the "whole point" of his expert testimony was to discuss "the

---

[5] Similarly, in support of the second point raised in connection with his first opinion, Econome concludes that "[e]mployers must and can implement Part 40 testing requirements while still providing an accommodation for sincerely held religious beliefs which, *by regulation*, they are also *required* to do."  (*Id.* at ¶ 36 (emphases added).)  This conclusion is supported solely by citations to an unidentified Administrative Code.  (*Id.* at ¶ 37.)  During his deposition, Econome explained that the reference was to the Administrative Code of *New York City* and was a mistake on his part.  (*See* Doc. No. 45 at 171:2–11.)

latitude" afforded to "a DER and discretion of a DER to have around anything to do with the regulations." (*Id.* at 67:23–68:3; *see also id.* at 87:16–88:3 (describing the "question" posed to him as whether "DER[s] have discretion and latitude in the regulations, and what are some scenarios both from what I can show in the regulation[s], as well as my experience, where we've applied discretion and have not had an issue with any federal entity around applying that discretion").); *cf. In re: Tylenol (Acetaminophen) Mktg., Sales Practices, & Products Liab. Litig.*, Civil Action No. 2:12-cv-07263, at *4 n.11 (E.D. Pa. July 27, 2016) (rejecting the plaintiff's argument that the expert's opinion represented a "regulatory fact and not a legal determination" because "to reach the conclusions which both the court and [the expert] have reached about acetaminophen's status under the regulations, one would need to interpret the regulations in accordance with administrative and general law principles. This is a legal process, not a factual one").

In addition to discussing the meaning and scope of the relevant regulations, Econome also applies his interpretation of the regulations to the facts of this case, opining that SEPTA could have, and indeed, should have, acted differently toward Taylor. For example, in the third point of the first opinion, Econome opines that "SEPTA had discretion to postpone or cancel Mr. Taylor's April 6, 2022 test." (Doc. No. 26-1 at ¶ 38.) Similarly, in the fifth point supporting his first opinion, Econome concludes that "SEPTA's DER had discretion at multiple stages of the testing process that was initiated on April 6, 2022 to accommodate Mr. Taylor' religious belief by canceling the random test, postponing the test or testing before sunrise or after sunset, or . . . stopping the entire process and cancelling it administratively." (*Id.* at ¶ 48.) Finally, in support of his second opinion, Econome concludes that "[r]ather than choose to accommodate Mr. Taylor's request that he not be tested during Ramadan, which it could easily have done without

12

violating DOT relations [sic], SEPTA chose not to." (*Id.* at ¶ 55.)

Each statement is Econome's opinion about what was permitted under the regulations and whether SEPTA's conduct in Taylor's case complied with them—opinions which are impermissible under the case law of this Circuit. *See Berckeley Inv. Grp., Ltd.*, 455 F.3d at 218 (discussing *United States v. Leo*, 941 F.2d 181 (3d Cir. 1991) and explaining that in *Leo*, the expert's testimony was admissible because "the expert *did not* give his opinion as to what was required under the law or whether the defendant complied with the Act" (emphasis added) (internal citations omitted)); *id.* (finding that the expert witness in *Berckeley* could not "testify as to whether [the plaintiff] complied with legal duties that arose under the federal securities laws," i.e., whether the plaintiff's "sales of NMFS stock were exempt from registration requirements," the "legal effect of the various SEC pronouncements" regarding the relevant regulations," and whether, "in light of the apparent routine industry practice[,] it was reasonable for [the plaintiff] to have believed that it was entitled to [a regulatory] exemption"); *Krys v. Aaron*, 112 F. Supp. 3d 181, 192 (D.N.J. 2015) (finding the expert "unquestionably invades the Court's province by rendering a *legal opinion* concerning whether various agents of Refco, SPhinX, and PlusFunds complied with their obligations under federal securities law"); *FedEx Ground Package Sys., Inc.*, 695 F. Supp. 2d at 221–23 (excluding expert opinion where the witness "repeatedly opines as to what is 'required under the law,'" about "whether the parties 'complied with the Act' or other statutory requirements," and whether, "if certain facts are true, then a particular legal conclusion (i.e., infringement) will follow"); *SEC v. McDermott*, CIVIL ACTION NO. 19-4229-KSM, 2022 WL 952895, at *13 (E.D. Pa. Mar. 30, 2022) (excluding expert opinion that "MIA and McDermott failed to act in the best interest of their advisory clients" because such testimony went "directly to one of the central legal issues in this case—whether Defendants breached their

fiduciary duty to their clients"); *In re: Tylenol (Acetaminophen) Mktg., Sales Practices, & Products Liab. Litig.*, Civil Action No. 2:12-cv-07263, at *4 (E.D. Pa. July 27, 2016) (excluding expert opinion "about whether acetaminophen would be considered Generally Recognized as Safe and Effective, or GRASE" under the relevant FDA regulations, because the opinion "would require a legal interpretation of the meaning of GRASE," and although the expert, an attorney with more than 30 years' experience, is "qualified to make such an interpretation . . . , it is not within the scope of his role as an expert.  It is for the court to make this legal determination"); *QVC, Inc. v. MJC Am., Ltd.*, Civil Action No. 08-3830, 2012 WL 13565, at *3 (E.D. Pa. Jan. 4, 2012) (excluding expert's conclusion that the plaintiff's letters did "not comport with the CPSC's requirements for a product safety recall" because the expert's opinion "crosses over the line from admissible testimony to inadmissible legal opinion"); *In re Wellbutrin SR Antitrust Litig.*, Civil Action Nos. 04–5525, et al., 2010 WL 8425189, at *2 (E.D. Pa. Mar. 31, 2010) (excluding expert opinions where "large portions of each expert report contain explanation of specific areas of patent law—including prosecution history estoppel, the doctrine of equivalents, and the meaning of *Warner-Jenkinson*—and conclusions of law—including whether GSK had an objectively reasonable basis to file its 798 patent infringement suits . . . .  It is the province of this court, and not the experts, to educate the jury on those specific areas of law relevant to plaintiffs' 798 patent sham litigation claim").

Econome's opinions are particularly problematic in this case because the regulations in Part 40 changed in May 2023, just after the last drug test challenged by Taylor in this case.  As the Court explains at length in the contemporaneously filed summary judgment Memorandum, the new regulations and the agency explanation accompanying those regulations provide significant discussions about the extent of discretion afforded to DERs to cancel a random drug

test and mark it as an administrative non-event.  *See* Addition of Oral Fluid Specimen Testing for

Drugs, 88 F.R. 27596-01, 2023 WL 3173277, at *27623 (May 2, 2023).  Econome relies on

those new regulations and the accompanying discussion in support of his opinions, even though

they were promulgated after Taylor's tests and as such, have little relevance to SEPTA's actions

in this case.  (*See* Doc. No. 26-1 at ¶¶ 45, 46, 48.)

 For those reasons, the Court finds the opinions in Econome's expert report are

impermissible legal conclusions and precludes Taylor from offering those opinions as evidence

in this case.

  **B.**  **Opinions Given During a Deposition**

 Taylor nevertheless argues that "Econome's testimony does not invade the province of

the Court" because it is "about how employers in the real world exercise their discretion under

the Regulations."  (Doc. No. 39 at 16–17.)  He reasons that Econome's discussion of the

regulations and their scope is merely background information and that this "legal context is

necessary to explaining the custom and practice in the industry" (*id.* at 17), which he discusses at

length in his deposition (*see* Doc. No. 50 at 4).

 It is true that an expert may permissibly opine about a custom or practice in a particular

industry.  *See, e.g.*, *In re: Tylenol (Acetaminophen) Mktg., Sales Practices, & Products Liab.*

*Litig.*, Civil Action No. 2:12-cv-07263, at *3 (E.D. Pa. July 27, 2016) ("[A]n expert may offer

testimony about business or trade customs and practices without invading the province of the

court."); *McDermott*, 2022 WL 952895, at *12 ("Testimony about whether a party's conduct

comports with industry custom and practice is permissible; testimony about whether a party's

conduct comports with the law is not.").  Such cases present thorny issues of admissibility,

however, because "the line between admissible and inadmissible expert testimony as to the

customs and practices of a particular industry often becomes blurred when the testimony

concerns a party's compliance with customs and practices that implicate legal duties." *Berckeley Inv. Grp., Ltd.*, 455 F.3d at 218.  Courts considering such close cases have noted that "district courts have discretion to allow expert legal testimony where it would be helpful to the trier of fact to understand the evidence, *but they cannot allow experts to explain the law*." *In re Wellbutrin SR Antitrust Litig.*, Civil Action Nos. 04–5525, et al., 2010 WL 8425189, at *2 (E.D. Pa. Mar. 31, 2010) (emphasis added) (quotation marks and citations omitted).  "Similarly, expert testimony is properly admitted to explain the custom in a given field, *so long as the expert is not permitted to opine on what the law required*." *Id.* (emphasis added) (quotation marks omitted).

The problem with Taylor's argument is that in his expert report, Econome does not explain a custom or practice broadly accepted in the industry of regulatory drug testing.  Indeed, the word "custom" does not appear anywhere in Econome's expert report.  Instead, Econome's opinions on custom and practices in the drug testing industry appear in his expert deposition, where, as discussed above, he opined about background drug testing protocols present within the industry.[6]

SEPTA argues that the Court cannot consider any additional opinions given during Econome's deposition because they were not included in his expert report as required by Federal

---

[6] During his deposition, Econome also testified at length about the advice that he and his company typically give to clients about, among other things, the "shy bladder procedures [and] protocols" and about scheduling Muslim employees for testing during Ramadan.  (*See* Econome Dep. Tr. at 28:9–37:2.)  But these "opinions" suffer from the same defect as the opinions contained in Econome's report.  He is opining about how he interprets the testing regulations and the advice he gives to clients based on those interpretations; he is *not* opining about wide-spread industry practices.  In addition, although Econome testified that his Ramadan guidance was "confirmed" by an FTA auditor named George Gilpatrick, his discussions with Gilpatrick occurred in September or October 2023 (Econome Dep. Tr. at 39:8–40:10, 60:1–62:22), which was after the testing at issue in this case and more importantly, after the agency issued revised regulations and guidance on the discretion afforded DERs (*see id.* at 138:19–139:11 (explaining that his opinions regarding Ramadan were based on the regulations, "as well as guidance given subsequent," and his own "personal experience" and "professional experience in running into various situations to include the Ramadan, and never having an FTA auditor have a finding against it")).

Rule of Civil Procedure 26(a)(2)(B).  That rule states that an expert witness report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i).  When a party fails to comply with Rule 26, Federal Rule of Civil Procedure 37(c)(1) comes into play, and "the party is not allowed to use th[e] information" excluded from the witness report "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The Third Circuit has held that the exclusion of evidence under Rule 37 is an "'extreme' sanction," the appropriateness of which turns on a number of factors.  *Meyers v. Pennypack Woods Home Ownership Assn.*, 559 F.2d 894 (3d Cir. 1977), *overruled on other grounds by Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985).[7]  The five "Pennypack factors" are:

> (1) 'the prejudice or surprise in fact of the party against whom excluded witnesses would have testified' or the excluded evidence would have been offered; (2) 'the ability of that party to cure the prejudice'; (3) the extent to which allowing such witnesses or evidence would 'disrupt the orderly and efficient trial of the case or of other cases in the court'; (4) any 'bad faith or willfulness in failing to comply with the court's order'; and (5) the importance of the excluded evidence.

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012) (citing *Pennypack*, 559 F.2d at 904–05); *see also Gillum v. United States*, 309 F. App'x 267, 269 (10th Cir. 2009) (discussing four factors (which are identical to the first four factors identified in *Pennypack*) that "guide a Rule 37(c)(1) determination" (citing *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999))).  Here, the *Pennypack* factors weigh in favor of admitting

---

[7] In this way, the Third Circuit seems to have split from the Seventh Circuit, which held, without any discussion of Rule 37, that "Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony" because doing so undermines the purpose of the rule: "to shorten or decrease the need for expert depositions." *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) (citing *Salgado v. General Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998)).

Econome's testimony about industry customs for selecting employees for random testing, the protocols in place if an employee fails a drug test, and the common practice used for scheduling follow-up tests.  (Econome Dep. Tr. at 43:21–55:7, 74:6–16, 149:21–150:11, 191:19–193:13.)

As to the first factor, SEPTA will not suffer substantial prejudice or surprise if Taylor is allowed to rely on Econome's additional opinions because his opinions as to industry custom are consistent with the opinions included in his report and largely consistent with SEPTA's own procedures for random testing.  *See ZF Meritor, LLC*, 696 F.3d at 298 (finding first and second factors weighed against exclusion because the expert's "new calculations will be based on data from the initial report, which Eaton has been aware of for nearly three years"); *cf. Quinn v. Consol. Freightways Corp. v. Delaware*, 283 F.3d 572, 577 (3d Cir. 2002) ("[The defendant] therefore knew of [the witness's] testimony for months before attempting to strike it as a last minute surprise that justified sanctions as a discovery abuse.  Not only is it clear that counsel for [the defendant] was not surprised by evidence of this hotel encounter, but he concedes that any prejudice from admitting this testimony was minimal at best because it afforded him an additional avenue to impeach [the plaintiff's] own testimony.").

The second factor also weighs against exclusion because SEPTA was not impeded in its ability to cure what little prejudice it did suffer.  SEPTA had an opportunity to question Econome about his new opinions during the deposition, and to the extent SEPTA believed it needed to depose Econome again to address, it could have done so during the two weeks remaining before the close of discovery or asked the Court for additional time.  It is telling that SEPTA did neither.  *See Bayer HealthCare LLC v. Baxalta Inc.*, No. 16-cv-1122-RGA, 2019 WL 297039, at *6 (D. Del. Jan. 22, 2019) ("It seems that any prejudice Plaintiff may suffer could have been cured.  Although Plaintiff is not obligated to cure prejudice of Defendants' making,

the fact that Plaintiff chose not to spend any effort addressing Dr. Zalipsky's new theories, via a sur-reply or in deposition, indicates that Plaintiff did not view the new theories as having a substantial impact on the case.  It thus follows that Plaintiff is unlikely to suffer any significant prejudice from Dr. Zalipsky's testimony related to those theories.  Therefore, the first and second factors weigh against exclusion."); *Miller v. Trans Union, LLC*, Civil No. 3:12–CV–1715, 2015 WL 2089965, at *4 (M.D. Pa. May 6, 2015) ("In short, having been aware of the Stango report now since January 2015, we are confident that the plaintiff is now fully prepared to meet the conclusions set forth in that report.  Of course, if the plaintiff concludes that he is not fully prepared to address that report on class certification, he may seek relief in the form of an order allowing additional time for discovery, or some other lesser remedy, and we are prepared to consider such a request.  However, in this setting, where the plaintiff has eschewed other relief in favor of exclusion of Dr. Stango's declaration, we do not believe that a balancing of the equities favors granting this extreme form of relief.").

As to the third factor, allowing Taylor to rely on Econome's additional opinions will not disrupt the orderly and efficient flow of the case.  As noted above, the Court contemporaneously rules on the parties' cross-motions for summary judgment, and Econome's permissible opinions were not material to the Court's decision on those cross-motions because the Court understands the regulatory framework from reading the regulations and agency guidance in effect when Taylor tested in 2022 and 2023.  In other words, the Court did not need to consider Econome's opinions and there is no need for additional briefing on summary judgment.  The only remaining issue for trial is damages, and, as we discuss in more depth in connection with the fifth *Pennypack* factor, Econome's permissible opinions are likewise of little relevance to that issue. *Cf. ZF Merito, LLC*, 696 F.3d at 298–99 (finding third factor weighed in against exclusion

because "[a]ny concern that granting Plaintiffs' motion would prevent Eaton from being able to effectively prepare to address DeRamus's new damages estimates at trial is no longer relevant, nor is there any risk that granting Plaintiffs' motion would excessively delay a trial on liability").

The fourth factor also weighs in favor of admitting Econome's additional opinions as to background and customs because there is no suggestion of bad faith by Taylor. *See, e.g.*, *TQ Delta, LLC v. 2Wire, Inc.*, Civil Action No. 13-1835-RGA, 2019 WL 1529952, at *2 (D. Del. Apr. 9, 2019) (finding fourth factor weighed against exclusion because the court found the timing was not "a result of bad faith or willful deception"); *Vectura Limited v. GlaxoSmithKline, LLC*, Civil Action No. 16-638-RGA, 2019 WL 1436296, at *2 (D. Del. April 1, 2019) (same).

Finally, as for the fifth *Pennypack* factor, the additional opinions provided by Econome is of minimal importance but not irrelevant. If this case were to proceed to trial on liability, Econome's additional opinions could have provided important context for the jury. The particulars of the drug testing industry are not normally understood by the general public, and Econome's discussion of background information and industry customs would provide the jury with a framework that could have been crucial to it in reaching a decision. That said, this case is *not* proceeding to trial on issues of liability for the reasons the Court explains in its contemporaneously filed Memorandum on the parties' cross-motions for summary judgment. Accordingly, the Court finds the fifth *Pennypack* factor is neutral. *See, e.g.*, *Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*, Civil Action No. 19-1334-CJB, 2022 WL 17617809, at *1 (D. Del. Dec. 7, 2022) ("Finally, the last Pennypack factor is about neutral. While Mr. Green's reliance on the license (which he describes in some detail in his expert report) indicates that the license is somewhat important to Plaintiffs' damages case, it is just one of several agreements considered by Mr. Green, and thus Plaintiffs have other probative evidence

on this front." (cleaned up)); *Bayer HealthCare LLC*, 2019 WL 297039, at \*6 (finding the fifth factor neutral because "for the same reason that I find insignificant prejudice to Plaintiff, I find that the new theories lack importance"); *Baptiste v. Rohn*, Civil Action No. 2013-0104, 2016 WL 1273884, at \*6 (D.V.I. Mar. 29, 2016) ("In view of the countervailing considerations, the Court concludes that this fifth *Pennypack* factor is neutral—it does not weigh either in favor or against exclusion of the evidence of lost wages."); *TQ Delta, LLC*, 2019 WL 1529952, at \*4 ("The fifth Pennypack factor is neutral.  While Dr. Walker's opinions support Defendant's noninfringement contentions, Defendant, by its own admission, did not realize the need to respond to Dr. Cooklev's and Dr. Almeroth's contentions until receipt of Plaintiff's opening summary judgment brief.").

In sum, four of the *Pennypack* factors weigh in favor of allowing Econome's additional opinions and one is neutral.  Accordingly, the Court declines to strike Econome's additional opinions under Rule 37.  *See Quinn*, 283 F.3d at 577 (finding district court abused its discretion when it struck testimony because "it [wa]s clear that [the defendant] had known about [the witness's] description of the hotel incident for over seven months; any prejudice was neutralized because [the defendant's] trial counsel was confident he could cross-examine [the plaintiff] based upon [the witness's] testimony; there was no suggestion that the trial would be interrupted; and although the trial court scolded [the plaintiff's] attorney when she offered reasons for [the plaintiff] not having supplemented her original deposition testimony, there was no specific finding of bad faith or willfulness").

\*     \*     \*

Because the expert opinions in Econome's expert report are impermissible legal conclusions, Econome is foreclosed from offering those opinions in connection with the pending

motions for summary judgment and at trial.  Nevertheless, assuming Rule 702 is satisfied,

Econome is permitted to offer custom and practice testimony consistent with the opinions given

during his deposition and as recounted in this Memorandum.

> ### C.    Reliability under Rule 702 and *Daubert*

That leaves SEPTA's argument that Econome's permissible opinions are nevertheless

impermissible under Rule 702 and *Daubert*.  Federal Rule of Evidence 702 outlines the

conditions that must be met for a witness to testify as an expert:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[8]  This Rule requires the trial judge to act as a "gatekeeper," ensuring that "any

and all expert testimony or evidence is not only relevant, but also reliable."  *Pineda v. Ford

Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (cleaned up); *see also Sikkelee v. Precision

Airmotive Corp.*, No. 4:07-CV-00886, 2021 WL 392101, at *2 (M.D. Pa. Feb. 4, 2021) ("A

district court exercises more control over experts than over lay witnesses," because "expert

evidence can be both powerful and quite misleading" given "the difficulty in evaluating it."

---

[8] SEPTA appears to rely on an older version of Rule 702 in its briefing.  (Doc. No. 26 at 10.)  The Court uses the current language of Rule 702, which was most recently amended in December 2023.

(quotation marks omitted)).  "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999).

To be admissible under Rule 702, expert testimony must satisfy "three major requirements:  (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda*, 520 F.3d at 244.  These factors are often referred to as "qualification," "reliability," and "fit."  *See Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) ("We have explained that Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit.").

The party proposing the expert witness must show that each prong—qualification, reliability, and fit—is satisfied by a preponderance of proof.  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 743 & 744 n.11 (explaining that the proponent must make more than a *prima facie* showing that a technique is reliable); *Ellison v. United States*, 753 F. Supp. 2d 468, 476 (E.D. Pa. 2010) ("The burden is on the proponent of the evidence—here the plaintiff—to establish admissibility by a preponderance of the evidence.").  However, at all times, we must remember that the Rules of Evidence generally "embody a strong preference for admitting any evidence that may assist the trier of fact," and Rule 702 specifically has a "liberal standard of admissibility." *United States v. Downing*, 753 F.2d 1224, 1230 (3d Cir. 1985); *see also Oddi*, 234 F.3d at 156 ("The test is not whether the expert might have done a better job."  (cleaned up)).

Here, SEPTA takes issue only with the reliability of Econome's methods.  (*See* Doc. No.

26 at 20–22.)[9]  Under the reliability prong, an "expert's testimony is admissible so long as the process or technique the expert used in forming the opinion is reliable."  *Pineda*, 520 F.3d at 247 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742); *see also Schneider ex rel. Schneider*, 320 F.3d at 404 (explaining that Rule 702's reliability prong looks to whether the proffered testimony is "based on the methods and procedures of science rather than on subjective belief or unsupported speculation" (cleaned up)).  In other words, the proffered testimony "must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation" and the "expert must have good grounds for his or her belief."  *Schneider ex rel. Schneider*, 320 F.3d at 404 (cleaned up).  Reliability is not intended to be a high standard, "nor is it to be applied in a manner that requires the plaintiffs to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable."  *Oddi*, 234 F.3d at 145 (quotation marks omitted).  "The test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct," but instead, "whether the particular opinion is based on valid reasoning and reliable methodology."  *Id.* at 145–46; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 744 ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect.").

SEPTA argues that Econome's testimony is "inadmissible for its total lack of reliable methodology," and because "[e]ven if the court were to find that Mr. Econome did use a reliable methodology, that methodology has never been applied to drug testing while fasting during

---

[9] Some courts consider whether an expert opinion offers an impermissible legal opinion under the "fit" prong.  For ease of analysis, the Court here views the two issues separately.

Ramadan." (Doc. No. 26 at 20–22 (referencing eight reliability factors applied in the Third Circuit).) But this argument, and SEPTA's strict reliance on the reliability factors first outlined in *Daubert* and the Third Circuit's decision in *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985),[10] are somewhat misplaced.

Econome's opinions do not rest upon technical or scientific knowledge, and as such, the methodology used to formulate those opinions will not consist of a scientific formula or mathematical equation. As Taylor notes in his briefing (*see* Doc. No. 39 at 14), the Supreme Court recognized almost 25 years ago that not all expert testimony is the same:

> Engineering testimony rests upon scientific foundations the reliability of which will be at issue in some cases. In other cases, the relevant concerns may focus upon personal knowledge or experience. As the Solicitor General points out, there are many different kinds of experts, and many different kinds of expertise. . . . We agree with the Solicitor General that the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.

*Kumho Tire Co.*, 256 U.S. at 150 (cleaned up).

This Court has found that Taylor may rely on Econome's testimony to the extent he provides relevant background on the DOT's regulatory framework for drug testing and discusses customs and practices in the testing industry. His opinions on these issues are based on his 20 years of experience as a testing administrator and a consultant on regulatory compliance, and are, therefore, reliable. *See, e.g.*, *id.* (noting that in some cases "the relevant concern may focus upon

---

[10] Those factors are: (1) whether the method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Pineda*, 520 F.3d at 247–48. As the Court goes on to explain, the reference to error rates, hypotheses, and peer review shows that the factors are most often applicable to scientific and technical expertise, as opposed to expertise based on personal knowledge and experience.

personal knowledge or experience"); *McDermott*, 2022 WL 952895, at *12 ("Ms. Murray's testimony rests on her years of experience in the industry, and Courts in this Circuit have allowed experts to offer testimony based on such experience." (collecting cases)).  Accordingly, the Court rejects SEPTA's motion to the extent it challenges the reliability of Econome's permissible opinions.

## III.    CONCLUSION

Because the expert opinions in Econome's expert report are impermissible legal conclusions, Taylor is foreclosed from relying on those opinions as admissible evidence.  Taylor may, however, rely on Econome's opinions to the extent they provide relevant background information and discuss the customs and practices in the industry prior to May 2023.  An appropriate order follows.